No. 11-55805

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| PACIFIC ASIAN ENTERPRISES, a California corporation; et al., | ) ) ) D.C. No. 3:10-cv-01335-LAB-WVG Southern District of California, San Diego |
| Plaintiffs - Appellants, | ) |
| v. | ) ) |
| CROSS CHARTERING N.V., a foreign limited liability company; et al., | ) ) ) ) |
| Defendants - Appellees. | ) ) ) |

Appeal From The United States District Court
For The Southern District of California

-------------------------------------------------------------------------------------

APPELLEE CROSS CHARTERING N.V.'S BRIEF

-------------------------------------------------------------------------------------

Alan Nakazawa, State Bar No. 84670
alan.nakazawa@cnc-law.com
Ken D. Sato, State Bar No. 252543
ken.sato@cnc-law.com
COGSWELL NAKAZAWA & CHANG, LLP
444 West Ocean Boulevard, Suite 1250
Long Beach, California 90802-8131
Telephone: (562) 951-8668

Attorneys for the Defendant - Appellee
CROSS CHARTERING N.V.

## CORPORATE DISCLOSURE STATEMENT

Cross Chartering N.V. is a company organized under the laws of Belgium. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

Page Nos.

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT REGARDING ADDENDUM TO BRIEF . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      I.    The Parties Agreed In The Bill Of Lading That U.S. COGSA
           Would Apply To The Yacht And Govern The Liability of Cross
           Chartering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      II.   The Harter Act Does Not Apply To The Bill of Lading . . . . . . . . . 19

               A.  The Harter Act Does Not Apply Where The Parties
                  Agree to Apply COGSA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

               B.  The Harter Act Was Also Superseded By COGSA For
                  Foreign Trade . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      III.  A Belgian Court Will Apply U.S. COGSA, The Law of The
            Contract, Not Belgian Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

IV.   Cross Chartering's Stipulation That COGSA And The Fair
      Opportunity Doctrine Should Apply In A Belgian Court  Only
      Reinforces What The Bill of Lading Already Provides And Responds
      To The Skepticism Of Appellants' Belgian Counsel That A Belgian
      Court Might Resort To Belgian Law . . . . . . . . . . . . . . . . . . . . . . . . . 26

V.    The Appellants Failed to Overcome The Presumption Of Validity Of
      The Forum Clause By Clearly Showing Enforcement Of The Foreign
      Clause Would Be Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            A.  The Legal Standard Enunciated in *Bremen* and *Sky
            Reefer* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            B.  The District Court Applied The Correct Legal
            Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

            C.  A Belgian Court Will Not Enforce Clause 3(a) And
            Exonerate Cross Chartering From Liability . . . . . . . . . . . . . 33

            D.  Clause 15 of the Bill of Lading Has Been Upheld By
            The Ninth Circuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

            E.  A Belgian Court Is Capable Of Applying the Fair
            Opportunity Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

                  1.  A Potential Diminished Recovery In Belgian Does
                  Not Invalidate The Antwerp Forum Clause . . . . . . . . 42

                  2.  Appellants Were Afforded A Fair Opportunity
                  To Declare A Higher Value And Avoid The $500
                  Limitation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

# <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                    <u>Page Nos.</u>

*Acciai Speciali Terni USA, Inc. v. M/V. Berane*
182 F. Supp. 2d 503 (D. Md. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Akiyama Corp. of Am. v. M.V. Hanjin Marseilles*
162 F.3d 571 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*AlohaCare v. Haw. Dep't of Human Serv.*
572 F.3d 740 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Atel Financial Corp. v. Quaker Coal Co.*
321 F.3d 924 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Baker v. Delta Air Lines, Inc.*
6 F.3d 632 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*BBC Chartering & Logistics, GmbH & Co. v. Vestas-American*
*Wind Technology, Inc.*
C09-5121 RBL, 2009 WL 1812251 (W.D.Wash. June 23, 2009) . . . . . . . . .  29, 31

*Bigge Equipment Co. v. Maxpeed Intern. Transport Co., Ltd.*
229 F. Supp. 2d 968 (N.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Blanchard Lumber v. SS Anthony II*
259 F. Supp. 857 (S.D.N.Y. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20, 21, 23

*M/S Bremen v. Zapata Off-Shore Co.*
407 U.S. 1 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 28, 29, 30, 31

# TABLE OF AUTHORITIES

(Continued)

Cases                                                                    Page Nos.


*Carman Tool & Abrasives, Inc. v. Evergreen Lines*
871 F.2d 897 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46, 47, 48


*Capital Partners Int'l Ventures, Inc. v. Danzas Corp.*
309 F. Supp. 2d 1138 (N.D. Cal. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24


*Chembulk Trading LLC v. Chemex Ltd.*
393 F.3d 550 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12


*Columbia Machine v. DFDS Tranport*
2008 A.M.C. 640 (C.D. Cal. 2007) . . . . . . . . . . . 17, 18, 19, 23, 37, 38, 46-47, 48


*Commonwealth Petrochemicals, Inc. v. S/S Puerto Rico*
607 F.2d 322 (4th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-23


*Deltamax Freight System v. M/V Aristotelis*
1999 A.M.C. 1789 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18


*Dream Palace v. County of Maricopa*
384 F.3d 990 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


*Federal Ins. Co. v. Union Pacific R. Co.*
651 F.3d 1175 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 37, 41, 42


*Fireman's Fund Ins. Co. v. M/V. DSR Atlantic*
131 F.3d 1336 (9th Cir. 1998) . . . . . . . . . . . . . . . . . 6, 8, 29, 30, 31, 32, 37, 41, 42

## <u>TABLE OF AUTHORITIES</u>
(Continued)

<u>Cases</u>                                                                 <u>Page Nos.</u>

*Hartford Fire Ins. Co. v. Calmar Steamship Corporation*
404 F. Supp. 442 (W.D. Wa. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13, 17

*Heli-Lift Ltd. v. M/V OOCL FAITH*
2003 A.M.C. 30 (C.D. Cal. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 43

*Holland American Line, Inc. v. Wartsila North America, Inc.*
485 F.3d 450 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Husain v. Olympic Airways*
316 F.3d 829 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Indussa Corp. v. S.S. Ranborg*
377 F.2d 200 (2d Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Institute of London Underwriters v. Sea-Land Serv., Inc.*
881 F.2d 761 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . 11, 16, 20, 38, 39, 45, 46

*Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corporation*
130 S. Ct. 2433 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 29

*Kearney by & Through Kearne v. Litton Precision Gear, Div.*
*of Litton Sys., Inc.*,
CV 87-8335-KN, 1988 WL 236112 (C.D. Cal. 1988) . . . . . . . . . . . . . . . . . . . . 28

*Kelso Enterprises, Ltd. v. M/V Wisida Frost*
8 F. Supp.2d 1197 (C.D. Cal. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 29, 30, 44

# TABLE OF AUTHORITIES

(Continued)

<u>Cases</u>                                                          <u>Page Nos.</u>

*Klamath Water Users Protective Ass'n v. Patterson*
204 F.2d 1206 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Kukje Hwajae Ins. Co., Ltd. v. M/V Hyundai Liberty*
408 F.3d 1250 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 29

*Majestics Electronics v. M/V Jin He*
1999 A.M.C. 1700 (C.D. Cal. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35, 43

*Matter of Arbitration Between Mitsubishi Corp. of
Tokyo & Conakry,*
92 CIV. 8587 (PKL), 1993 WL 254994 (S.D.N.Y. June 30, 1993) . . . . . . . . . 25-26

*Mazda Motors v. M/V Cougar Ace*
565 F.3d 573 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

*Mitsubishi Motors Corp. v. Solar Chrysler-Plymouth*
473 U.S. 614 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

*Mori Seiki USA Inc. v. M.V. Alligator Triumph*
990 F.2d 444 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 45, 46

*Mori Seiki USA Inc. v. M.V. Alligator Triumph*
1992 A.M.C. 1850 (C.D. Cal. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Murphy v. Schneider National, Inc.*
362 F.3d 1133 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

# TABLE OF AUTHORITIES
(Continued)

Cases                                                                          Page Nos.

*Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing*
167 F.3d 99 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

*Nippon Fire & Marine Ins. Co. v. M/V. Spring Wave*
92 F. Supp. 2d 574 (E.D. La. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35, 43

*North River Insurance Co. v. Fed Sea/Fed Pac Line*
647 F.2d 985 (9th Cir. 1981)
*cert. denied*, 455 U.S. 948 (1982) . . . . . . .  11, 19-20, 21, 22, 23, 24, 25, 26, 38, 47

*PAC Global Insurance v. Gramter International*
2008 A.M.C. 1766 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 42, 43, 44

*Pannell v. United States Lines*
263 F.2d 497 (2d Cir. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 38, 39

*The Ponce*
67 F. Supp. 725 (D.N.J. 1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*PPG Industries, Inc. v. Ashland Oil Co. Thomas Petroleum Transit Division*
527 F.2d 502 (3d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*R.A. Argueta v. Banco Mexicano, S.A.*
87 F.3d 320 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

*Roby v. Corporation of Lloyd's*
996 F.2d 1353 (2d Cir. 1993) *cert. denied*, 510 U.S. 945 (1993) . . . . . . . . . .  31, 42

# TABLE OF AUTHORITIES

(Continued)

<u>Cases</u>                                                        <u>Page Nos</u>.

*Royal Exchange Assurance of Am. Inc. v. M/V Hoegh Dene*
1988 A.M.C. 868 (W.D. Wa. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

*Royal Ins. Co. v. Sea-Land Service Inc.*
50 F.3d 723 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 45

*Royal Insurance Co. v. M/V Animar*
1991 A.M.C. 2154 (S.D.N.Y. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

*Saudi Pearl Ins. Co., Ltd. v. M.V. Aditya Khanti*,
95 CIV 2174 (JFK), 1997 WL 291834 (S.D.N.Y. June 2, 1997) . . . . . . . . . .  16, 21

*Sea-Land Service, Inc. v. Lozen International*
285 F.3d 808 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22, 25

*Sinotrans Container Lines, Co. Ltd. v. N. China Cargo Serv., Inc.*
2008 A.M.C. 1284 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*Starrag v. Maersk, Inc.*
486 F.3d 607 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 20

*Sumitomo Corp. of America v. M/V Sei Kim*
632 F. Supp. 824 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Sunkist Growers, Inc. v. Adelaide Shipping Lines, Ltd.*
603 F.2d 1327 (9th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

# TABLE OF AUTHORITIES

(Continued)

<u>Cases</u>                                                                    <u>Page Nos.</u>

*Traveler's Indemnity Co. v. Vessel Sam Houston*
26 F.3d 900 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39, 48

*Uncle Ben's Int'l Div. of Uncle Ben's, Inc. v. Hapag-Lloyd Aktiengesellschaft*
855 F.2d 215 (5th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38, 40

*Union Steel America Co. v. M/V Sanko Spruce*
14 F. Supp. 2d 682 (D.N.J. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

*Vimar Seguros Y Reaseguros S.A. v. M/V Sky Reefer*
515 U.S. 528 (1995) . . . . . . . . . 5, 10, 11, 28, 29, 31, 32, 33, 36, 38, 39, 41, 42, 43

*Vision Air Flight Serv. v. M/V National Pride*
155 F.3d 1165 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

*Wemhoener Pressen v. Ceres Marine Terminals, Inc.*
5 F.3d 734 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38, 39, 40

*Yang Mach. Tool Co. v. Sea-Land Serv.*
58 F.3d 1350 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48


<u>Statutes</u>                                                                  <u>Page Nos.</u>

46 U.S.C. §190 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

46 U.S.C. §1300 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 22

## <u>TABLE OF AUTHORITIES</u>
(Continued)

<u>Statutes</u>                                                    <u>Page Nos.</u>

46 U.S.C. §30701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 24, 25, 37

COGSA §1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 15, 16, 17, 18, 24, 25

COGSA §3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 10, 37, 38, 39, 40, 41, 42

COGSA §4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 10, 39, 45, 46

COGSA §12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

COGSA §13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 24, 25


<u>Other Authorities</u>                                              <u>Page Nos.</u>

Circuit Rule 28-2.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Fed. R. Civ. Proc. 52(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATEMENT OF ISSUES

The issue on appeal is whether the District Court abused its discretion when it held that it would not be unreasonable to enforce the Antwerp forum selection clause in the bill of lading under the circumstances of this case.

## STATEMENT REGARDING ADDENDUM TO BRIEF

Except for the Hague Rules and Hague Visby Rules which are contained in the addendum to this Brief, all applicable statutes, treaties, and rules are contained in the Addendum to Appellants' Opening Brief.

## STATEMENT OF THE CASE

Appellants Pacific Asian Enterprises ("PAE") and RLI Insurance Company ("RLI") (collectively the "Appellants") commenced this action against Appellees Cross Chartering N.V. ("Cross Chartering") and SSA Pacific, Inc. ("SSA") for damage to a yacht. ER0081-0085. PAE and RLI alleged a cause of action for breach of the contract and a cause of action for reckless, intentional and negligent damage to the yacht. *Id.* Although suit was also brought *in rem* against the M.V. CATALONIA (the "Vessel"), the Vessel was never served.

Cross Chartering filed its Answer to the Complaint, and raised the forum selection clause as an affirmative defense. SER117.

Cross Chartering filed its motion to dismiss the action pursuant to the Belgian forum selection clause in the bill of lading. SER039-061. SSA filed a notice of joinder. SER030. Appellants filed their opposition to Cross Chartering's

motion to dismiss. ER0035-53. Cross Chartering filed a Reply Memorandum in support of the motion to dismiss. SER012-SER-022. Appellants were granted leave to file a Sur-Reply and filed their Sur-Reply in opposition to the motion to dismiss. ER0014; ER0022-0026.

The Court found the motion to dismiss suitable for decision without oral argument and took the matter under submission. ER0015. On April 19, 2011, the Court issued its Order granting Cross Chartering's and SSA's motion to dismiss. ER0001-0013. This appeal followed. ER0021.

## STATEMENT OF THE FACTS

Cross Chartering is an ocean carrier, organized under the laws of Belgium, with its principal place of business in Antwerp. ER0067 ¶6. Cross Chartering was the charterer of the Vessel. ER0068 ¶12.

PAE is a California company which designs and sells Nordhavn yachts. ER0001. Cross Chartering has been carrying yachts for PAE from Asia to the United States since 2000-2001 and during this ten year period, carried over 140 yachts for PAE. ER0067 ¶8.

SSA is a stevedoring company in the Port of San Diego and was hired by Cross Chartering to discharge the subject yacht from the Vessel. ER0068 ¶13.

On or about May 11, 2009, PAE booked the subject yacht for shipment with Cross Chartering from Kaohsiung, Taiwan to San Diego. ER0068 ¶10. A Booking Note dated May 13, 2009 was issued by Cross Chartering and signed by PAE. ER0068 ¶10, ER0071. In the Booking Note, the parties agreed that the yacht

would be carried on the deck of the Vessel (*See* Description of Goods). Further, under "Special Terms" on the front of the Booking Note, the parties confirmed that PAE declared no value for the cargo and that the U.S. COGSA package limitation applies. ER0071.

Cross Chartering received the yacht from the Taiwanese shipper/builder, Ta Shing Yacht Building Co. Ltd. ("Ta Shing"), and the yacht was loaded on the deck of the Vessel at Kaohsiung for its voyage to San Diego. ER0068 ¶11. Cross Chartering issued Bill of Lading numbered CCGJ28509KASD001 (the "Bill of Lading") to the shipper Ta Shing. ER0068 ¶11, ER0073-74. The Bill of Lading stated on the front in typewritten capital letters:

> CARRIED ON DECK WITH MERCHANTS' CONSENT AND AT THEIR RISK AS TO PERILS INHERENT IN SUCH CARRIAGE WITHOUT LIABILITY AND OR RESPONSIBILITY TO THE VESSEL OR CARRIER BUT IN ALL OTHER RESPECTS SUBJECT TO THE PROVISIONS OF THE UNITED STATES CARRIAGE OF GOODS BY SEA ACT 1936.

ER0073.

On the reverse side of the Bill of Lading, the "U.S. Trade" clause provided:

**U.S. Trade. Period of Responsibility**

(i) In case the Contract evidenced by this Bill of Lading is subject to the Carriage of Goods by Sea Act of the United States of America, 1936 (U.S. COGSA), then the provisions stated in said Act shall govern before loading and after discharge and throughout the entire time the cargo is in the Carrier's custody and in which event freight shall be payable on the cargo coming into the Carrier's custody.

-3-

(ii) If the U.S. COGSA applies, and unless the nature and value of the cargo has been declared by the shipper before the cargo has been handed over to the Carrier and inserted in this Bill of Lading, the Carrier shall in no event be or become liable for any loss or damage to the cargo in an amount exceeding USD500 per package or customary freight unit.

Clause 4 on the reverse side of the Bill of Lading provided:

**Law and Jurisdiction**

Disputes arising out of or in connection with this Bill of Lading shall be exclusively determined by the courts and in accordance with the law of the place where the Carrier has his principal place of business, as stated on Page 1, except as provided otherwise herein.

The yacht arrived in San Diego on the Vessel. While SSA was discharging the yacht, the yacht was dropped and was damaged. ER0083 ¶7.

PAE insured the yacht with RLI Insurance Company ("RLI") which allegedly paid PAE for the damages to the yacht less the deductible and thereafter brought this subrogation action with PAE against Cross Chartering and SSA. ER0082 ¶3.

## SUMMARY OF ARGUMENT

The District Court did not abuse its discretion in enforcing the Belgian forum clause under the circumstances of this case and its decision should be affirmed for the following principal reasons.

First, the Bill of Lading unambiguously provides that the Carriage of Goods by Sea Act ("COGSA") would apply to the yacht and would govern Cross

Chartering's liability. Given the agreement of the parties in the Bill of Lading to apply COGSA and given the international nature of the carriage, the Harter Act does not apply. Although the parties disagreed below which U.S. law applies to the yacht, neither COGSA nor the Harter Act forbid the parties from agreeing in the Bill of Lading on the forum to resolve their dispute.

Second, a Belgian court will apply COGSA as the law of the contract. Both Belgian counsel agreed that COGSA is the law of the contract and that a Belgian court is required to apply COGSA to this case. They only disagreed on the ability of the Belgian court to apply COGSA.

Third, Appellants failed to overcome the presumption of validity of the Belgian forum clause by clearly showing that enforcement would be unreasonable on public policy grounds. Appellants failed to show that they will be deprived of the right to pursue statutory remedies in a Belgian court or that the substantive law to be applied by the Belgian court will reduce Cross Chartering's obligations to the cargo owner below what COGSA guarantees.

Fourth, Appellants' skepticism regarding the ability of a Belgian court to apply COGSA is unwarranted. As the District Court correctly found, the is no reason to doubt the ability of the Belgian courts to apply U.S. law. Further, this skepticism regarding the ability of a Belgian court to apply U.S. law was rejected in *Sky Reefer* and is not sufficient grounds to invalidate the forum clause.

Fifth, a Belgian court will not enforce Clause 3(a) of the Bill of Lading since it clearly violates §3(8) of COGSA. In any event, Cross Chartering never

asserted below nor does it assert here that Clause 3(a) or any other clause of the Bill of Lading exonerates it from liability for negligence in the care of the yacht.

Sixth, a Belgian court will enforce Clause 15 (covenant not to sue) if it is enforceable under U.S. law. Under a recent decision of the Ninth Circuit, the covenant not to sue is enforceable under U.S. law because it an enforcement mechanism, not a reduction of the carrier's obligations that violates COGSA. Therefore, Belgian law and U.S. law appear to be the same on the validity of Clause 15.

Seventh, a Belgian court is capable of applying the fair opportunity doctrine of U.S. law and Appellants should make their arguments regarding the lack of fair opportunity to a Belgian court. In any event, a potential diminished recovery in Belgian does not invalidate a forum clause. Further, to the extent it is relevant on this appeal, PAE was afforded a fair opportunity to declare a higher value for the yacht and avoid COGSA's $500 package limitation because the requisite language of §4(5) of COGSA is recited in the Bill of Lading. Further, PAE made the conscious decision to not opt out of the limitation by insuring the yacht with RLI.

## STANDARD OF REVIEW

A District Court's order enforcing a forum selection clause is reviewed for abuse of discretion. *Kukje Hwajae Ins. Co., Ltd. v. M/V Hyundai Liberty*, 408 F.3d 1250, 1254 (9th Cir. 2005); *Fireman's Fund Ins. Co. v. M/V. DSR Atlantic,* 131 F.3d 1336, 1338 (9th Cir. 1998).

Appellants request that this Court deviate from Ninth Circuit precedent on

the standard of review and apply *de novo* review to this appeal. Appellants argue that *de novo* review is more appropriate because the issues involved in this appeal require interpretation of (1) pure questions of law, (2) federal law, and (3) foreign law. Appellants' Brief, p. 3.

The enforceability of a forum selection clause in this case did not involve pure questions of law. Forum selection clauses are presumptively valid under federal law and should not be set aside unless the party challenging the clause clearly demonstrates that enforcement would be unreasonable and unjust. *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12, 15 (1972). In the District Court, Appellants argued that it would be unreasonable to enforce the Belgian forum clause on public policy grounds because they would be deprived of the right to pursue statutory remedies in Belgium and a Belgian court would not enforce COGSA in the same manner as a U.S. court . The District Court correctly held that enforcement of the Belgian forum clause was not unreasonable under the circumstances. In doing so, it evaluated the credibility of the declaration testimony of Belgian counsel regarding how a Belgian court would apply U.S. law and the ability of the Belgian courts to apply U.S. law. The District Court found that the testimony of Peter Marcon, Appellants' Belgian counsel, was "unconvincing" and not credible, and found that there was no reason to doubt the ability of the Belgian courts to apply U.S. law. ER0001-00013. The "reasonableness" of enforcing the forum clause based on the credibility of the declaration testimony of Belgian counsel and certain factual findings was not a

pure question of law.  Further, the Ninth Circuit has applied the abuse of discretion review in similar cases.  *See* e.g. *Fireman's Fund v. M.V. DSR Atlantic*, 131 F.3d 1336 (9th Cir. 1997) (whether it was unreasonable to enforce a Korean forum clause in a maritime cargo action governed by COGSA against objections that a Korean court would not allow the cargo owner to assert an *in rem* claim against the vessel); *R.A. Argueta v. Banco Mexicano, S.A.,* 87 F.3d 320 (9th Cir. 1996) (whether it would be unreasonable to enforce a Mexico forum clause because appellants alleged that it would not receive a fair trial in Mexico).

Further, this appeal does not involve the review of a summary judgment on the interpretation of a federal statute that was present in *Torres Lopez* or the review of the constitutionality of a federal statute that was present *Seariver Maritime Fin'l Holdings* cited by Appellants at page 4 of their Brief.  This appeal also does not involve pure questions of foreign law.  The parties below and their Belgian counsel  agreed that U.S. law, the law of the contract, governed this dispute  but disagreed regarding the ability of a Belgian court to apply U.S. law. Based on the evidence, the District Court found no reason to doubt the ability of the Belgian courts to apply U.S. law.  ER0010 n.10 and ER0013.

Factual findings of the District Court are reviewed for clear error.  Fed. R. Civ. Proc. 52(a)(6); *Husain v. Olympic Airways,* 316 F.3d 829, 835 (9th Cir. 2002).

Prior Ninth Circuit published authority is binding within this Circuit unless

an en banc decision of this Court, a Supreme Court decision, or subsequent legislation undermines the precedential value of the decision. *Baker v. Delta Air Lines, Inc.,* 6 F.3d 632, 637 (9th Cir. 1993).

Absent exceptional circumstances, this Court will not consider issues raised for the first time on appeal. *AlohaCare v. Haw. Dep't of Human Serv.*, 572 F.3d 740, 744-45 (9th Cir. 2009); Circuit Rule 28-2.5. "This rule serves to ensure that legal arguments are considered with the benefit of a fully developed factual record, offers appellate courts the benefit of the district court's prior analysis, and prevents parties from sandbagging their opponents with new arguments on appeal." *Dream Palace v. County of Maricopa,* 384 F.3d 990, 1005 (9th Cir. 2004).

This Court may affirm the District Court's decision on any ground that has support in the record, whether or not the District Court relied on the same grounds or reasoning. *Atel Financial Corp. v. Quaker Coal Co*., 321 F.3d 924, 926 (9th Cir. 2003).

## ARGUMENT

## I.    The Parties Agreed In The Bill Of Lading That U.S. COGSA Would Apply To The Yacht And Govern The Liability of Cross Chartering

The United States Carriage of Goods By Sea Act ("COGSA") was enacted by Congress in 1936 as the United States version of the "Hague Rules", an international maritime convention for unification of certain laws relating to bills of lading signed in Brussels in 1925. (Former sections 46 U.S.C. §1300 *et seq.* were

-9-

recodified in the Note of 46 U.S.C. §30701 in 2006). The Hague Rules have been adopted by most of the major maritime nations of the world. *Vimar Seguros Y Reaseguros S.A. v. M/V Sky Reefer,* 515 U.S. 528, 536 (1995). COGSA establishes a comprehensive framework of the rights and liabilities by which shippers, vessels and carriers are governed for cargo damage. *Id.* at 536. COGSA imposes certain obligations on the carrier such as the duty to properly and carefully care for the cargo and the duty to exercise due diligence to make the ship seaworthy. §§3(1), 3(2). COGSA also forbids clauses in the bills of lading that relieve the carrier from liability arising from negligence. §3(8). On the other hand, COGSA allows the carrier to limit its liability to $500 per package or customary freight unit, unless the shipper declares the nature and value of the cargo before the shipment and inserts them in the bill of lading. 46 U.S.C. §30701 Note §4(5). Importantly, COGSA does not limit the ability of parties to agree to forum clauses in bills of lading. *Kawasaki Kisen Kaisha, Ltd. v. Regal- Beloit Corporation,* 130 S. Ct. 2433, 2440 (2010); *Sky Reefer*, 515 U.S. at 536- 537.

COGSA applies *ex proprio vigore* to every bill of lading issued for shipments to or from the United States in foreign trade. 46 U.S.C. §30701 Note §§1, 13. However, COGSA excludes under its definition of "goods", cargo which is stated in the bill of lading to be carried on deck and is so carried. 46 U.S.C. §30701, Note §1(c). In this case, the Bill of Lading states on the front that the yacht is "CARRIED ON DECK WITH MERCHANTS' CONSENT..." Therefore, COGSA does not apply *ex proprio vigore* to the yacht carried on deck.

-10-

Where COGSA does not apply by the force of its terms, the parties to a bill of lading may, as they did in this case, extend COGSA contractually to apply to cargo not otherwise covered by COGSA. *North River Ins. Co. v. Fed Sea/Fed Pac Line,* 647 F.2d 985, 987 (9th Cir. 1981), *cert. denied,* 455 U.S. 948 (1982) (COGSA applied to yacht carried on deck); *Institute of London Underwriters v. Sea-Land Serv., Inc.*, 881 F.2d 761, 763-64 (9th Cir. 1989) (applying COGSA to yacht carried on deck that was dropped during discharge); *Royal Ins. Co. v. Sea-Land Service Inc.*, 50 F.3d 723, 727 (9th Cir. 1995) (applying COGSA to yacht carried on deck that was dropped during discharge). The contractual extension of COGSA to situations where COGSA would not apply of its own force is routine in the shipping industry. *Starrag v. Maersk, Inc.*, 486 F.3d 607, 614 (9th Cir. 2007).

The typewritten clause on the front of the Bill of Lading states in capital letters:

> CARRIED ON DECK WITH MERCHANTS' CONSENT AND AT THEIR RISK AS TO PERILS INHERENT IN SUCH CARRIAGE WITHOUT LIABILITY AND OR RESPONSIBILITY TO THE VESSEL OR CARRIER **BUT IN ALL OTHER RESPECTS SUBJECT TO THE PROVISIONS OF THE UNITED STATES CARRIAGE OF GOODS BY SEA ACT 1936**

[Emphasis added].

General contract interpretation principles apply to a bill of lading which is a contract like any other contract. *Mazda Motors v. M/V Cougar Ace*, 565 F.3d 573, 577 (9th Cir. 2009); *Starrag*, 486 F.3d at 616. It is a fundamental principle of contract interpretation that "[c]ontract terms are to be given their ordinary

meaning," and "[w]henever possible, the plain language of the contract should be considered first." *Klamath Water Users Protective Ass'n v. Patterson,* 204 F.2d 1206, 1210 (9th Cir. 1999). Further, "[a] basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.,* 393 F.3d 550, 555 (5th Cir. 2004).

The plain meaning of the first part of this clause can only mean that the yacht would be carried on deck with the consent of the Merchant[1] and at the risk of the Merchant for perils inherent in such carriage. A bill of lading stating "on deck at shipper's risk" or other similar language places on the shipper the risk of customary and predictable risks of deck carriage (e.g. damage from exposure to elements) but the carrier remains responsible for damage resulting from negligence in the care of cargo, negligent stowage or failure to exercise due diligence to provide a seaworthy vessel. *See Hartford Fire Ins. Co. v. Calmar Steamship Corporation*, 404 F. Supp. 442, 447 n. 8 (W.D. Wa. 1975); *The Ponce*, 67 F. Supp. 725, 728 (D.N.J. 1946).[2]

---

[1] The word "Merchant" is defined in Clause 1 of the Bill of Lading as including the shipper, the receiver, the consignor, the consignee , the holder of the Bill of Lading, the owner of the cargo and any person entitled to possession of the cargo. ER0074.

[2] Cross Chartering does not contend that this clause exempts it from responsibility to exercise due care with respect to the cargo nor does it contend that dropping a yacht during discharge is a risk that is inherent in deck carriage. ER0006 n.7.

The plain meaning of the last part of the clause starting with "but in all other respects" can only mean that the carriage of the yacht and the carrier's liability will be subject to COGSA except for perils inherent in on-deck carriage. To construe it otherwise would violate the ordinary meaning of the words.

It is noteworthy that even Peter Marcon, Appellants' Belgian counsel, conceded below that the front side of the Bill of Lading incorporated COGSA to the yacht carried on deck and that COGSA, as the law chosen by the parties in the contract, would govern the liability of Cross Chartering and SSA for all risks and perils not inherent in carriage of goods on deck. ER0058 ¶5; ER0008. Similarly, Luc Wijfels, Cross Chartering's Belgian counsel, stated that the front side of the Bill of Lading explicitly declares the carriage subject to COGSA and that a Belgian court would apply COGSA as the law of the contract. ER0078, ¶7.

Given the explicit language on the face of the Bill of Lading, the District Court correctly found that "the bill of lading unambiguously provides that the liability of Cross Chartering and SSA is subject to the provisions of COGSA." ER0006.

For the first time on appeal, Appellants argue that the typewritten clause on the front of the Bill of Lading lacks the clarity to incorporate COGSA because it does not negate the exclusionary effect of Section 1(c) of COGSA on deck cargo. Appellants seek a "bright line rule" requiring that the language used in the clause incorporating COGSA must negate COGSA Section 1(c).

Appellants never raised this argument below. Appellants argued half

-13-

heartedly that the Harter Act, not COGSA, applied to the yacht (ER0046) but never argued below that the Bill of Lading lacked clarity to incorporate COGSA to deck cargo or that the clause incorporating COGSA must negate the exclusionary effect of Section 1(c) of COGSA to deck cargo.[3]  Perhaps Appellants did not do so because their own Belgian counsel, Mr. Marcon, was of the view that the Bill of Lading incorporated COGSA as the law of the contract.  ER0058 ¶5.  This Court should not consider Appellants' arguments for the first time on appeal.

In the event the Court considers Appellants' new arguments, they nonetheless lack merit.

Appellants argue that the reference to COGSA should be read in a vacuum separate from the rest of the clause.  To construe the reference to COGSA as not applying to the yacht carried on deck would render the reference to COGSA meaningless and superfluous.  It would illogical for the parties to agree to carry the yacht on deck and state in the same clause that the carriage is subject to COGSA if the parties did not intend for COGSA to apply.  The clause does not say that the carriage of the yacht on deck or the liability of Cross Chartering is subject to COGSA only where COGSA "applies *ex proprio vigore*" or where it "applies by the force of its terms" or where COGSA "compulsorily applies."[4]  No such

---

[3]    Appellants stated in their opposition below that "[t]he only issue is whether or not Appellants would be deprived of their right to purse statutory remedies and benefit from court-mandated protections."  ER0036.

[4]    In *Mori Seiki USA Inc. v. M.V. Alligator Triumph*, 900 F. 2d 444, 448 (9th Cir. 1993), a similar argument was made to the District Court and rejected.

-14-

language is used. The clause evidences the agreement of the parties that the liability of Cross Chartering for risks not inherent to on-deck carriage shall be governed by COGSA. The only ambiguity in the clause arises from Appellants strained and unreasonable reading of the clause.

Further, there are no cases, and Appellants have failed to cite any, that have held that a clause which provides for the application of COGSA to deck cargo must use certain language or must negate Section 1(c) of COGSA. Carriers and shippers have used various language in their bills of lading to evidence their agreement to apply COGSA to deck cargo and the courts have simply construed the plain meaning of the language and have given meaning to all of the terms. Certainly, the language in the bill of lading must be "sufficiently clear to guarantee the result." *Deltamax Freight System v. M/V Aristotelis*, 1999 A.M.C. 1789, 1793 (C.D. Cal. 1998). However, there are no cases supporting a "bright line rule" in interpreting the language of the Bill of Lading. Further, no court has held that the language used in the Bill of Lading in the instant case was not sufficient to apply COGSA to deck cargo.

None of the cases cited by Appellants beginning at page 11 of their Brief

---

Notwithstanding the plain meaning of Article 7 of the *Mori Seiki* bill of lading which extended COGSA's application to the period before loading and after discharging, the cargo owner argued to the District Court that Article 7 should be construed to mean that COGSA applies only when it applies by its own force or as a matter of law. 1992 A.M.C. 1850, 1851 (C.D. Cal. 1991). As the District Court noted, this construction renders Article 7 "mere surplusage, a tautology that says 'COGSA applies when it applies by its own force." 1992 A.M.C. at 1851.

held that certain specific language must be used in the bill of lading to apply COGSA to deck cargo or that the clause must negate Section 1(c) of COGSA.

In *Saudi Pearl Ins. Co., Ltd.*, 95 CIV. 2174 (JFK), 1997 WL 291834 at *3 (S.D.N.Y. June 2, 1997), the bill of lading contained a provision that the Hague Rules (i.e. COGSA) would apply to cargo stowed in containers shipped on deck. Since the cargo was stowed on deck but not in containers, the court held that COGSA does not apply to the cargo. The language at issue in *Saudi Pearl* was unlike the language on the front of the Bill of Lading in this case. Further, *Saudi Pearl* never stated that the language incorporating COGSA must negate §1(c).

In *Institute of London Underwriters*, 881 F.2d 761 (9th Cir. 1989), the language incorporating COGSA to deck cargo stated that the "defenses and limitations of said Act [COGSA] shall apply to goods whether carried on or under deck." *Id.* at 764. In *London Underwriters,* like here, the language in the Clause Paramount incorporating COGSA referred to deck cargo in the same clause. The language was sufficient for the court to apply COGSA to the yacht carried on deck. *London Underwriters* never held that specific language must be used to effectively apply COGSA to deck cargo or that the clause incorporating COGSA must negate §1(c).

In *Pannell v. United States Lines*, 263 F.2d 497 (2d Cir. 1959), the bill of lading provided in relevant part that in respect of goods carried on deck, the carrier shall have the benefit of the COGSA, "notwithstanding Section 1(c) thereof". *Id*. at 498. The language in the Cross Chartering Bill of Lading was not

-16-

at issue in *Pannell* and the court did not state that the language referring to Section 1(c) must be present for COGSA to apply to deck cargo.

*Deltamax* is instructive. In *Deltamax,* the front of the bill of lading contained a notation that the cargo would be "Stowed on Deck At Shipper's Risk and Expense" but, unlike the Bill of Lading in the instant case, did not reference COGSA on the front. In a separate clause, the bill of lading stated that COGSA's $500 limitation shall apply to all goods shipped to and from the United States but that clause did not otherwise reference on deck carriage. The court concluded that the "on deck" notation on the front along with the separate clause providing for COGSA's application was sufficient to advise the cargo owner that the limitation of liability would apply to cargo stowed on deck. *Id.* at 1793. *See also Hartford Fire Ins. Co. v. Calmar Steamship Corp.,* 404 F. Supp. 442, 445-46 (W.D. Wa. 1975) (COGSA applied to deck cargo where COGSA incorporated generally in a Clause Paramount of a charter party that did not reference deck cargo).

In the instant case, the Bill of Lading is even more explicit than the *Deltamax* bill of lading because the Bill of Lading states on the front in one typewritten clause that the yacht would be carried on deck and would be subject to COGSA.

In *Columbia Machine v. DFDS Tranport*, 2008 A.M.C. 640 (C.D. Cal. 2007), cited by Appellants on page 13 of their Brief, Clause 27 on the reverse side of the bill of lading merely incorporated COGSA generally without referring to deck cargo. While the court concluded that Clause 27 was not sufficient to apply

-17-

COGSA to deck cargo, it refused to adopt the position advocated by DFDS that Clause 27 needed to explicitly reference on-deck carriage. *Id.* at 647-648. The court indicated *Deltamax* might support the conclusion that the omission of deck cargo in Clause 27 did not matter given the reference to deck cargo on the front of the bill of lading but for Clause15(2) of the bill of lading which specifically provided that the Hague Rules would apply to deck cargo and therefore conflicted with Clause 27. *Id.* at 650. Unlike Clause 27 at issue in *Columbia Machine*, the typewritten clause on the front of the Bill of Lading issued by Cross Chartering specifically refers to "deck cargo" and the application of COGSA in the same clause. Although Clause 15(2) contained language unlike the language in the typewritten clause on the front of the Cross Chartering Bill of Lading, *Columbia Machine* never said that a clause applying COGSA or the Hague Rules to deck cargo must have certain language negating Section 1(c) of COGSA. The court merely interpreted the plain language of the bill of lading and tried to give meaning to all of its provisions. *Id.* at 647-651.

## II. The Harter Act Does Not Apply To The Bill of Lading

Appellants argue that another federal maritime statute, the Harter Act, 46 U.S.C. §190, *et seq.*, governs the liability of Cross Chartering for the damage to the yacht. The Harter Act was enacted in 1893 to regulate the terms of ocean carriage by dealing with the terms of bills of lading. With minor differences, the substantive obligations of a carrier to the cargo owner are the same under COGSA and the Harter Act. *Sumitomo Corp. of America v. M/V Sei Kim,* 632 F. Supp.

-18-

824, 833 n.9 (S.D.N.Y. 1985). Importantly, the Harter Act, like COGSA, does not forbid parties from agreeing to a forum selection clause. *Union Steel America Co. v. M/V Sanko Spruce*, 14 F. Supp. 2d 682, 685-86 (D.N.J. 1998).[5]

The Harter Act does not apply because (1) the parties agreed in the Bill of Lading to apply COGSA to the yacht, and (2) the Harter Act was superseded by COGSA for foreign trade.

## A. The Harter Act Does Not Apply Where The Parties Agree to Apply COGSA

As discussed in Section I above, parties can contract to apply COGSA to deck cargo that is stated in the bill of lading to be carried on deck. *See North River*, 647 F.2d at 987 n.3; *Institute of London Underwriters*, 881 F.2d at 763-64. Where parties agree to apply COGSA to a situation where COGSA does not apply by the force of its terms, the Harter Act does not apply. *North River*, 647 F.2d at 987; *Sea-Land Service, Inc. v. Lozen International,* 285 F.3d 808, 817 (9th Cir. 2002); *Starrag*, 486 F.3d at 615. This is exactly what the parties did in the instant case. They agreed to apply COGSA to the yacht carried on deck.

Appellants' reliance on the New York District Court decision in *Blanchard*

---

[5] Although the District Court correctly concluded that COGSA governed the liability of Cross Chartering for damage to the yacht, at least one district court in the Ninth Circuit has held that where a forum clause is enforceable, whether COGSA applies should be determined by the foreign forum. *See Kelso Enterprises, Ltd. v. M/V Wisida Frost*, 8 F. Supp. 2d 1197, 1203-04 (C.D. Cal. 1998).

*Lumber v. SS Anthony II*, 259 F. Supp. 857 (S.D.N.Y. 1966) is misplaced.

*Blanchard* involved lumber carried on deck that was damaged due to the improper stowage of the cargo on a voyage from Canada to the United States. The facts were completely distinguishable from the instant case. First, the bill of lading in *Blanchard*, unlike the Bill of Lading in the instant case, did not extend COGSA to apply to deck cargo. Instead, the parties agreed in the Clause Paramount of the bill of lading that Canadian Water Carriage of Goods By Sea Act would apply to cargo loaded in Canada. *Id.* at 861. COGSA was never at issue in *Blanchard*. Second, the court in *Blanchard* never decided the question whether the Canadian Act was applicable to deck cargo notwithstanding its deck cargo exclusion because the court decided as a matter of law that the Harter Act, not the Canadian Act, applied. *Id.* at 865. The court decided to apply the Harter Act over the Canadian Act to deck cargo because it concluded that the Canadian Act would enforce the "demise clause" that would not be enforceable under COGSA.[6] *Id.* at 865. Hence, the Harter Act was applied because Canadian law would enforce the "demise clause" and because the bill of lading did not incorporate COGSA to deck cargo.

//

---

[6] A "demise clause" in a bill of lading provides that the contract is between the cargo owner and shipowner only and that only the shipowner can be liable for the loss. *Id.* at 861, 865-66.

-20-

## B. The Harter Act Was Also Superseded By COGSA For Foreign Trade

To the extent *Blanchard* is relevant at all, it does not recite the law of the Ninth Circuit.[7] In *North River*, the Ninth Circuit addressed squarely whether the Harter Act or COGSA applied to yachts carried on deck from Hong Kong to the United States. The cargo insurer argued, like Appellants do here, that the Harter Act applies *ex proprio vigore* when COGSA does not. 647 F.2d at 987 n.3. The Court rejected this argument for two reasons. First, the Court found that the parties had agreed contractually to apply COGSA to the yachts carried on deck. *Id.* at 987. Second, the Court rejected the cargo insurers argument that Harter Act applied *ex proprio vigore.* According to the Ninth Circuit, "[t]o the extent that the Harter Act governed international trade leaving from or entering American ports, it was superseded in 1936 by [COGSA]." *Id.* at 987.

According to the Court:

> Insurers argue that the Harter Act controls this case because it applies *ex proprio vigore* when COGSA does not. The Harter Act was preserved for domestic rather than international trade, [citations omitted], as well as the time prior to loading and after delivery. [citations omitted]. Accordingly, Insurers' argument is not supported where the contract involves international carriage where COGSA expressly renders the Harter Act inapplicable. 46 U.S. Code, sec. 1300.

---

[7]    Likewise, the District Court decisions in *Saudi Pearl* and *Z.K. Marine, Inc.* cited by Appellants at pp. 21 and 22 of their Brief, to the extent they are relevant at all, do not recite the law of the Ninth Circuit.

*Id.* at 987 n.3.

Thus, another reason the Harter Act does not apply *ex proprio vigore* to the yacht is because the yacht in the instant case was carried in foreign trade, not domestic trade (i.e. between U.S. ports).

Following *North River*, the Ninth Circuit has consistently stated that COGSA supersedes the Harter Act for international carriage and that after COGSA, the Harter Act was preserved only for domestic carriage and for the period before loading and after discharge. *See Federal Ins. Co. v. Union Pacific R. Co.,* 651 F.3d 1175, 1177 n.2 (9th Cir. 2011); *Sea-Land v. Lozen International,* 285 F.3d 808, 817 (9th Cir. 2002) (COGSA superseded the Harter Act with respect to foreign trade); *Sunkist Growers, Inc. v. Adelaide Shipping Lines, Ltd.* , 603 F.2d 1327, 1333-34 (9th Cir. 1979) ("It is well recognized that the Hague Rules or COGSA have superseded the Harter Act with respect to foreign trade and are incorporated by every bill of lading for foreign transport to and from the United States"); *Bigge Equipment Co. v. Maxpeed Intern. Transport Co., Ltd.*, 229 F. Supp. 2d 968, 974 (N.D. Cal. 2001) (the Harter Act was superseded by COGSA for international trade)*. See also Commonwealth Petrochemicals, Inc. v. S/S PUERTO RICO*, 607 F.2d 322, 324-25 (4th Cir. 1979) ("When Congress enacted COGSA, it felt that the problems of domestic and foreign commerce required discrete treatment, the need for uniformity being greater in the international trade, H. Rep. No. 2218, 76th Cong., 1st Sess., quoted in *PPG Industries, Inc. v. Ashland*

*Oil Co. Thomas Petroleum Transit Division,* 527 F.2d 502, 505 n.12 (3d Cir. 1975), and therefore limited COGSA's applicability to voyages in foreign commerce, expressly preserving Harter for domestic carriage").

For the first time on appeal, Appellants attempt to make a statutory argument that the Harter Act should apply where COGSA is not incorporated by contract to apply to deck cargo. Appellants' Brief, p. 23. They also argue for the first time on appeal that Ninth Circuit district courts have declined to follow *North River* in cases involving international carriage but where damage occurs before loading or after discharge (i.e. outside the "tackle-to-tackle period). Appellants' Brief, p. 26. In the District Court, Appellants never made these arguments and, in fact, never cited or discussed *North River.* Instead, in the District Court, Appellants relied solely on *Blanchard Lumber* and *Columbia Machine* in arguing that the Harter Act governs Cross Chartering's liability. *See* ER0046-0047.

In any event, Appellants' reliance on *Capital Partners Int'l Ventures, Inc. v. Danzas Corp.*, 307 F. Supp. 2d 1138 (N.D. Cal. 2008), *Cigna Ins. Asia Pac., Ltd., Thiti Lert Watana,* and *Fed. Ins. Co.* is unavailing. Appellants' Brief, p. 26. In these cases, unlike the instant case where the yacht was damaged during discharge, the cargo was damaged after discharge following an international voyage. COGSA applies by the force of its terms to the period commencing when the goods are loaded on a ship until the goods are discharged from the ship so COGSA did not apply *ex proprio vigore* to the cargo damage in these cases. 46 U.S.C. §30701 Note §1(e). In each of these cases, the courts properly

-23-

acknowledged that the Harter Act applies *ex proprio vigore* before loading or after discharge unless the parties contractually extend COGSA to apply before loading or after discharge. These district court cases did not follow *North River* and its pronouncement that the Harter Act does not apply to foreign trade because Section 12 of COGSA explicitly preserves the Harter Act for damage before loading or after discharge.[8] *See Capital Partners,* 309 F. Supp. 2d at 1144 ("*North River* is distinguishable from the case at bar because that case involved cargo damage on the ship, not after the discharge").

In addition to explicitly preserving the Harter Act before loading and after discharge, COGSA also explicitly states that it is not to apply to the carriage of goods by sea between ports of the United States and its possessions (i.e. domestic carriage) unless the parties have incorporated COGSA in the bill of lading. 46 U.S.C. §30701 Note §13. Given that COGSA explicitly provides that it is to apply to foreign trade and also explicitly preserves the Harter Act before loading and after discharge, and during domestic carriage, the Ninth Circuit in *North River, Sea-land Service*, and *Sunkist Growers* correctly concluded that the Harter Act was superseded for international carriage and was preserved only for domestic carriage and the time before loading and after discharge. 46 U.S.C. §30701 Note §§1,13; *North River*, 647 F.2d at 987 and n.3.

---

[8] Section 12 of COGSA provides: "Nothing in this chapter shall be construed as superseding any part of sections 190 to 196 of this title [the Harter Act], insofar as they relate to the time when the goods are loaded on or after the time they are discharged from the ship."

### III. A Belgian Court Will Apply U.S. COGSA, The Law of The Contract, Not Belgian Law

Appellants argue that a Belgian court will apply Belgian law because the Bill of Lading does not incorporate COGSA and makes Belgian law applicable. *See* Brief, p. 29.  Appellants' argument fails for several reasons.

First, as demonstrated above and as correctly found by the District Court, the typewritten clause on the face of the Bill of Lading provides for the application of COGSA to the yacht.  ER0006.

Second, Clause 4, the forum clause, provides for the law of the place where the Carrier has its principal place of business (i.e. Belgian law), "except as provided elsewhere herein."  ER0074.  The Bill of Lading provides elsewhere in the typewritten clause on the front of the Bill of Lading that the carriage of the yacht will be subject to COGSA.

Third, to the extent there is any conflict between the printed terms on the reverse side of the Bill of Lading and the typewritten clause on the front side, the typewritten clause shall prevail.  *Matter of Arbitration Between Mitsubishi Corp. of Tokyo & Conakry,* 92 CIV. 8587 (PLK), 1993 WL 254994 at *2 (S.D.N.Y. June 30, 1993).

Fourth, both Belgian counsel concluded that a Belgian court would find that COGSA was the law of the contract.  Cross Chartering's Belgian counsel, Luc Wijfels, unequivocally states in his declaration that "the front side of the bill of the bill of lading explicitly declares the carriage subject to the provisions of the

United States Carriage of Goods by Sea Act 1936" and therefore, "a Belgian court shall apply United States law." ER0078; ER0028 ¶3. Similarly, Appellants' Belgian counsel, Peter Marcon, concedes that a Belgian court would find that COGSA applies to the yacht for all risks and perils other than those inherent in carriage of goods on deck by virtue of the typewritten clause on the front of the Bill of Lading. ER0058-59 ¶5. Hence, Appellants' argument that a Belgian court has no grounds to apply U.S. law based on the terms of the Bill of Lading and will apply Belgian law is directly contradicted by their Belgian counsel.[9]

## IV. Cross Chartering's Stipulation That COGSA And The Fair Opportunity Doctrine Should Apply In A Belgian Court Only Reinforces What The Bill of Lading Already Provides And Responds To The Skepticism Of Appellants' Belgian Counsel That A Belgian Court Might Resort To Belgian Law

Appellants argue that the District Court erred in relying on Cross Chartering's and SSA's offer to stipulate to the application of COGSA and the fair

---

[9]     In another futile attempt to create ambiguity where there is none, Appellants discuss Clause 3 on the reverse side of the Bill of Lading and incorrectly suggest that COGSA is the corresponding Hague-Visby Rules in the country of destination. *See* Brief, pp. 29-30. The United States has not adopted the Hague-Visby Rules but instead, has adopted COGSA, our version of the Hague Rules. *Acciai Speciali Terni USA, Inc. v. M/V. Berane*, 182 F. Supp. 2d 503, 505-506 (D. Md. 2002).

opportunity doctrine in Belgium.[10]  *See* Brief, p. 31.  Appellants' argument lacks merit.

First, the District Court did not rely solely on the proposed stipulation in finding that the Bill of Lading provides for the application of COGSA to the yacht. As the District Court states in its Order, the proposed stipulation only reinforces what the Bill of Lading already provides.  ER0007 n.8.  The proposed stipulation also only reinforces what Belgian counsel for Appellants conceded (i.e. that COGSA governed the liability of Cross Chartering for all risks not inherent in on deck carriage).  Hence, it was not illogical and highly inequitable for Cross Chartering to offer such stipulation.  To the contrary, it was perfectly consistent with the agreement of the parties in the Bill of Lading and the opinion of Appellants' Belgian counsel.

Second, the proposed stipulation was offered by Cross Chartering in response to Mr. Marcon's skepticism that a Belgian court might resort to Belgian law in considering whether Clause 3(a) and Clause 15 of the Bill of Lading were enforceable.  Cross Chartering offered this stipulation as to applicable law which would be enforced in a Belgian court to put to rest any concern that a Belgian court might resort to Belgian law in determining the enforceability of Clause 3(a) or Clause 15 of the Bill of Lading or would not apply the fair opportunity doctrine under U.S. law.  SER024 ¶5; SER014; ER0033 ¶16.

---

[10]    Cross Chartering also was willing to stipulate that Appellants' claim against Cross Chartering is and will not be time barred in Belgium.  SER024 ¶6.

Further, Appellants are simply wrong that such stipulations are not allowed. Where dismissing actions to a foreign court on the grounds of *forum non conveniens*, it is not unusual for a court to protect a claimant's rights in the foreign court by conditioning such dismissal on the stipulation of the moving party to submit to the jurisdiction of the foreign court or waive the statute of limitations. *See Kearney by & Through Kearne v. Litton Precision Gear, Div. of Litton Sys., Inc.,* CV 87-8335-KN, 1988 WL 236112 at *1-2 (C.D. Cal. August 5, 1988); *Sinotrans Container Lines, Co. Ltd. v. N. China Cargo Serv., Inc.,* 2008 A.M.C. 1284, 1290-1291 (C.D. Cal. 2008). Where, as here, a proposed stipulation will be enforced by a foreign court and is intended to benefit another party, it is reasonable for courts to allow such stipulations. ER0007 n.8.

## V. The Appellants Failed to Overcome The Presumption Of Validity Of The Forum Clause By Clearly Showing Enforcement Of The Foreign Clause Would Be Unreasonable

### A. The Legal Standard Enunciated in *Bremen* and *Sky Reefer*

The United States Supreme Court has reiterated the primacy of forum clauses in admiralty cases. *Bremen*, 407 U.S. 1 (1972) (enforcing London forum clause in towage case); *Sky Reefer*, 515 U.S. 528 (1995) (enforcing Tokyo arbitration clause in bill of lading governed by COGSA)[11]; *Kawasaki Kisen*

---

[11] A foreign arbitration clause is a subset of a forum selection clause and the same principles apply. *Sky Reefer*, 515 U.S. at 534; *Fireman's Fund,* 131 F.3d at 1339.

*Kaisha, Ltd. v. Regal-Beloit Corp.,* 130 S. Ct. 2433 (2010) (enforcing Tokyo District Court forum clause in bill of lading governed by COGSA where cargo was damaged in a train derailment in Oklahoma). Following *Bremen* and its progeny, courts in the Ninth Circuit have consistently enforced forum clauses in bills of lading. *Fireman's Fund Ins. Co.,* 131 F.3d 1336 (9th Cir. 1997) (enforcing Korean forum clause in bill of lading governed by COGSA); *Kukje Hwajae Ins. Co. v. M/V Hyundai Liberty*, 408 F.3d 1250 (9th Cir. 2005) (enforcing Korean forum clause in bill of lading governed by COGSA); *Kelso Enterprises., Ltd. v. M/V Wisida Frost*, 8 F. Supp. 2d 1197 (C.D. Cal. 1998) (enforcing English forum clause in bill of lading). *BBC Chartering & Logistics, GmbH & Co. v. Vestas-American Wind Technology, Inc.*, C09-5121 RBL, 2009 WL 1812251, at *1, 3 (W.D.Wash. June 23, 2009) (enforcing identical forum clause and dismissing action in favor of Germany).

Mandatory forum clauses are presumptively valid in admiralty cases. *Bremen,* 407 U.S. at 10. This presumption of validity may be overcome but the burden is a heavy one. As *Bremen* observed, a forum clause between experienced and sophisticated parties should be honored "absent some compelling and countervailing reason." *Bremen*, 407 U.S. at 12. The party opposing enforcement of a forum clause must "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id*. at 15. The Supreme Court construed the "unreasonable and unjust" exception very narrowly. A forum clause may be "unreasonable and unjust" where (1) there

-29-

is fraud or overreaching in the inducement of the forum clause in the contract; (2) the contractual forum is so seriously inconvenient that a party will be for all practical purposes deprived of its day in court; or (3) enforcement of the forum clause would contravene a strong public policy of the forum in which suit is brought. *Id.* at 12, 15, 18; *Fireman's Fund*, 131 F.3d at 1338; *Holland American Line, Inc. v. Wartsila North America, Inc.,* 485 F.3d 450, 457 (9th Cir. 2007) (citing *Murphy v. Schneider National, Inc.,* 362 F.3d 1133, 1140 (9th Cir. 2004)); *Kelso Enterprises, Ltd.,* 8 F. Supp. 2d at 1202; *BBC Chartering & Logistics*, 2009 WL 1812251 at *2.

Appellants argued below and argue on appeal that the Belgian forum clause is unreasonable and should not be enforced because enforcement would contravene the public policy of the United States. Appellants argue that an Antwerp court will enforce Clause 3(a) of the Bill of Lading that could exonerate Cross Chartering for any liability for deck cargo, will enforce Clause 15 of the Bill of Lading that could deprive Appellants of a remedy against SSA, and that a Belgian court will not apply the fair opportunity doctrine of U.S. law in the same manner as a U.S. court. ER0036-37; Appellants' Brief, p. 33.

A forum clause should not be set aside on public policy grounds merely because "the foreign law or procedure [may] be different or less favorable than that of the United States." *Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir. 1993), *cert. denied,* 510 U.S. 945 (1993) (citing *Mitsubishi Motors Corp. v. Solar Chrysler-Plymouth,* 473 U.S. 614, 629 (1985)). Instead, Appellants must

show that they will be deprived of the "right to pursue statutory remedies." *Sky Reefer*, 515 U.S. at 539. Or alternatively, that the "substantive law to be applied will reduce the carrier's obligations to the cargo owner below what COGSA guarantees." *Fireman's Fund*, 131 F.3d at 1338 (citing *Sky Reefer*, 515 U.S. at 538-39); *PAC Global Insurance v. Gramter International*, 2008 A.M.C. 1766, 1769 ( C.D. Cal. 2007). The carrier's obligations that cannot be reduced are those obligations and duties of the carrier, such as the duty to properly care for the cargo and duty to exercise due diligence to provide a seaworthy vessel. *Fireman's Fund,* 131 F.3d at 1339 (citing *Sky Reefer,* 515 U.S. at 534).

### B. The District Court Applied The Correct Legal Standard

Appellants argue that the District Court applied a less stringent standard than required by *Sky Reefer*. However, a reading of the District Court's well-reasoned Order confirms that the District Court applied the correct legal standard. ER0001-13. For example, on page 5 of the Order, the District Court states that under *Sky Reefer,* "the relevant question is not whether a Belgian court will apply United States law in the same manner as a United States court would, but "whether the substantive law to be applied will reduce the carrier's obligations to the cargo owner below what COGSA guarantees." ER0005, lines 5-16 (citing *Fireman's Fund,* 131 F.3d at 1339, quoting *Sky Reefer,* 515 U.S. at 538*); see also* ER0009, lines 11-17 ("the question is not whether a Belgian court will enforce United States law but whether Belgian law will reduce the obligations of Cross Chartering and SSA below what COGSA guarantees."). Further, the District Court correctly

evaluated whether a Belgian court would enforce Clauses 3(a) and 15 of the Bill of Lading so as to violate COGSA and preclude Appellants from the right to pursue a substantive right of recovery. ER0006-0010. The District Court found the testimony of Appellants' Belgium counsel "unconvincing" and too conjectural to support a finding that a Belgian court was not competent to apply U.S. law, or would apply U.S. law in a manner that would violate COGSA, or would preclude Appellants from pursuing a statutory remedy. ER0008-0010 ("It would be another matter entirely if Mr. Marcon could show, in no uncertain terms, that a Belgian court would be either categorically opposed to enforcing COGSA, or inclined to enforce COGSA in a manner that is clearly offensive to the spirit of COGSA. But all Mr. Marcon does, really, is invoke the mere possibility that a Belgian court would struggle to understand and enforce COGSA, or else enforce Belgian law in manner that might trample PAE's protections under COGSA"). The District Court found no reason to doubt the ability of the Belgian court to apply U.S. law. ER0009, ER0012, ER0013. Further, Appellants misinterpret the District Court's comment in its conclusion that "[t]he question in this case is not whether a Belgian court will apply United States law, or whether PAE can obtain the exact relief it seeks under Belgian law, but whether PAE can walk into a Belgian court and advance, with some meaningful hope of success, the same claims and arguments it would advance in this Court." ER0013. As evident from the District Court's citation to the legal standard in *Sky Reefer* following its statement, this was simply

-32-

another way of saying that Appellants would not be deprived of its right to pursue its statutory remedies under U.S. law in a Belgian court.

## C.  A Belgian Court Will Not Enforce Clause 3(a) And Exonerate Cross Chartering From Liability

Clause 3(a) of the Bill of Lading  provides in relevant part that "[t]he Carrier shall in no case be responsible . . . with respect to deck cargo and live animals." ER0074.  Appellants argue that the Belgian courts will enforce this clause if they are forced to pursue their claim in Antwerp.  *See* Brief, p. 34-37. Appellants' argument is unfounded.

At the outset, it is worth noting that Cross Chartering never asserted below and does not assert before this Court that Clause 3(a) or any other clause of the Bill of Lading exonerates Cross Chartering for negligence.  To the contrary, Cross Chartering conceded below that the "the carrier remains responsible for damage resulting from negligence in the care of the cargo. . ."  SER045 n.3; *See also* Court's Order, ER0006, n.7, ER0010, n.11.

Luc Wijfels, Cross Chartering's Belgian counsel, opined that a Belgian court will apply COGSA as the law of the contract and that a Belgian court will not enforce Clause 3(a) unless such clause was enforceable under U.S. law. ER0079 ¶10; ER0028-29 ¶¶4, 5, 6, 7, 8.  According to Mr. Wijfels, a Belgian court is legally bound to interpret and apply COGSA as it would be interpreted by a U.S. court.   ER0028 ¶5.  He firmly adds that the parties will have no problem whatsoever in establishing that Clause 3(a) is not enforceable provided that

statutory and case authority is provided by counsel. ER0029 ¶¶5, 6, 8. Mr.
Wijfels also points out that the Commercial Court in Antwerp has a long tradition
of maritime cases,[12] which are exclusively handled by specialized chambers,
presided by professional, legally trained and experienced judges, some of them
former maritime lawyers assisted by "laymen" from the maritime industry and that
the Antwerp courts frequently deal with foreign law.[13] ER0029 ¶7.

In contrast, Mr. Marcon, Appellants' Belgian lawyer, is far from
convincing. He concedes that a Belgian court will apply the law of the contract to
this dispute and that the typewritten clause on the front of the Bill of Lading
provides that Cross Chartering's liability for all risks and perils not inherent in
deck carriage will be governed by COGSA. ER0057 ¶4; ER0058 ¶5. But Mr.
Marcon then, as the District Court characterized it "backpedals" (Order ER0008)
and says that he "cannot exclude" that a Belgian Court "could apply" Clause 3
"which could" result in the carrier being not liable at all because Belgian Courts
have limited experienced in applying foreign law and might have difficulty
understanding foreign law. ER0060 ¶¶5, 6. Mr. Marcon goes on to say that while
Belgian courts seized by a case governed by foreign law are obliged to apply such

---

[12]     Antwerp is the second largest sea port in Europe and has a rich
maritime tradition. http://www.portofantwerp.com/portal/page/portal/POA_EN/
Uw%20/partner%20voor%20Europa/Markante%20cijfera. (Last viewed October
27, 2011).

[13]     A forum clause in a bill of lading designating Antwerp as the forum for
resolution of disputes has been enforced. *See Royal Insurance Co. v. M/V Animar,*
1991 A.M.C. 2154 (S.D.N.Y. 1991).

foreign law, there is a substantial risk that such foreign law is not applied in the same manner as a U.S. court. ER0060 ¶6. The mere possibility that a Belgian court would have difficulty interpreting U.S. law is not enough. He also talks in hypothetical terms and as the District Court observed, "does not speak to the facts of this particular case." ER0009. Mr. Marcon's testimony fails to establish that Appellants will be deprived of a right to pursue a statutory remedy in Antwerp or that the law to be applied in Antwerp will reduce the carrier's obligations below what COGSA guarantees. The District Court correctly found Mr. Marcon's testimony "unconvincing," "vague" and "conjectural." ER0008, 0009, 0013.

Appellants reliance on *Majestics Electronics v. M/V Jin He,* 1999 A.M.C. 1700 (C.D. Cal. 1999), *Nippon Fire & Marine Ins. Co. v. M/V. Spring Wave,* 92 F. Supp. 2d 574 (E.D. La. 2000) and *Heli-Lift Ltd. v. M/V OOCL FAITH*, 2003 A.M.C. 30 (C.D. Cal. 2001) is unavailing. In contrast to the instant case, there was no reasonable doubt in these cases that the contractual forum's "foreign law" would preclude a substantive right of recovery and allow the carrier to escape COGSA's liability rules. In the instant case, the testimony of both Belgian counsel confirm that the Belgian court will be required to apply COGSA as the law of the contract, and it is unreasonable to conclude based on the vague and conjectural testimony of Mr. Marcon that a Belgian court does not have the ability to apply U.S. law. Indeed, this skepticism regarding the competency of foreign courts to apply our laws was rejected in *Sky Reefer*, 515 U.S. at 537 ("Petitioner's skepticism over the ability of foreign arbitrators to apply COGSA. . . must give

-35-

way to contemporary principles of international comity and commercial practice.").

For the first time on appeal, Appellants argue that even where COGSA applies as a matter of contract to deck cargo, its successful incorporation will not render invalid bill of lading terms like Clause 3(a) that are inconsistent with COGSA. *See* Brief, p. 39-44. Appellants never made this argument below. In fact, Appellants argued just the opposite below. In the District Court, Appellants argued that Clause 3(a) violates COGSA. ER0040-41 ("Clearly, exoneration of a carrier from all liability violates US COGSA, which CC and SSA contend applies and also violates the Harter Act, which Plaintiffs believe applies. Either way, exoneration would deprive Plaintiffs of a statutory remedy available under U.S. law."). In an about-face, Appellants now say that Clause 3(a) would be enforceable even where COGSA has been incorporated in the Bill of Lading.

Appellants' argument, in any event, is flawed because Clause 3(a) clearly violates COGSA whether COGSA applies by the force of its terms or by contract and the cases cited by Appellants are easily distinguishable.

Bill of lading clauses that relieve a carrier of liability arising from negligence or breach of their duties provided in COGSA are null and void under COGSA. *Fed. Ins. Co. v. Union Pac. R. Co.,* 651 F.3d at 1179-80 (In a case governed by COGSA as a matter of contract, the court nevertheless distinguished between impermissible clauses that reduce the carrier's obligations and clauses

-36-

that only enforce the "mechanisms" of enforcing a shipper's rights); *Fireman's Fund,* 131 F.3d at 1339.

Clause 3(a) clearly violates Section 3(8) of COGSA which prohibits bill of lading clauses that relieve a carrier from liability arising from negligence:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence. . .in the duties and obligations provided in this section. . . shall be null and void. . .

46 U.S.C. §30701, Note §3(8).

Moreover, the fact that COGSA applies as a matter of contract to the yacht carried on deck does not make Clause 3(a) enforceable. In *Columbia Machine,* the court concluded that the Hague Rules applied to the deck cargo as a matter of contract pursuant to Clause 15(2). *Columbia Machine*, 2008 A.M.C. at 650-51. Clause 15(3), like Clause 3(a) in the instant case, stated that the carrier shall be under no liability for goods carried on deck. The court correctly found that Clause 15(3) was invalid because it disclaimed the carrier's liability for negligence in violation of the Hague Rules. According to the court, "[b]oth the Hague Rules and COGSA prevent a carrier from disclaiming liability for its own negligence." *Id.* at 651.

Further, Appellants reliance on *North River, Institute of London Underwriters, Pannell, Wemhoener Pressen v. Ceres Marine Terminals, Inc.,* 5 F.3d 734 (4th Cir. 1993), and *Uncle Bens's Int'l Div. of Uncle Ben's Inc. v. Hapag*

*Lloyd Arktiengesellschaft*, 855 F.2d 215 (5th Cir. 1988) is misplaced. None of these cases involved a bill of lading clause that disclaimed liability for damage to cargo in direct violation of Section 3(8) of COGSA.

In *North River,* the Ninth Circuit enforced a Montreal forum clause where COGSA applied by contract to yachts carried on deck that were destined for Milwaukee. At the time of the decision, courts had invalidated forum clauses where COGSA applied by the force of its terms. *Indussa Corp. v. S.S. Ranborg,* 377 F.2d 200 (2d Cir. 1967). The Court held that where COGSA is incorporated into a contract for foreign carriage, parties may provide for the forum to litigate just as they agree to apply COGSA as the governing law. *North River,* 647 F.2d at 989. Importantly, the Court concluded that "**[b]ecause the language of COGSA is not inconsistent with foreign jurisdiction clauses**, we reject the view that COGSA preempts all contract terms when its sole force is by incorporation into a contract for foreign transportation." [Emphasis added]. *Id.* Thus, the Court enforced the forum clause because there was no language in COGSA that prohibited forum clauses. Indeed, the Court was correct because *Indussa* was subsequently overruled by the Supreme Court in *Sky Reefer* which held that a foreign forum clause did not violate Section 3(8) of COGSA. 515 U.S. at 534-535. Unlike a forum clause, Clause 3(a) which attempts to exonerate the carrier for damage to deck cargo, clearly violates Section 3(8) of COGSA.

In *Institute of London Underwriters,* the Ninth Circuit enforced the parties' definition of "package" in the bill of lading where COGSA applied as a matter of

contract to a yacht carried on deck. Given that Congress did not define the term "package" in Section 4(5) of COGSA, it is not surprising the Court enforced the more specific definition of package in the bill of lading over the general reference to package in the Act where COGSA applied by contract. *Travelers Indemnity Company v. Vessel Sam Houston*, 26 F.3d 895, 900 (9th Cir. 1994). Similarly, in *Pannell*, the Second Circuit enforced the definition of "package" in the bill of lading where COGSA applied as a matter of contract to a yacht carried on deck. In so doing, the court saw "no reason why this specific definition should not prevail over the general term "package" contained in the Act." *Pannell,* 263 F.2d at 498. Neither *Inst. of London Underwriters* nor *Pannell* involved a bill of lading clause that violated an expressed provision of COGSA.

*Wemhoener Pressen* is likewise inapposite. There, the bill of lading was unclear whether it incorporated COGSA for the post discharge period. The court decided that state law did not apply and that the liability of the stevedores should be analyzed under the terms of the bill of lading and both COGSA and the Harter Act. *Wemhoener,* 5 F.3d at 739-740. The primary issue in the case was whether the Himalaya Clause sufficiently extended the $500 limitation to the stevedores. *Wemhoener* did not involve the question whether a bill of lading clause disclaiming liability for cargo damage was invalid under COGSA.

*Uncle Ben's* is likewise inapposite. In *Uncle Ben's*, the bill of lading contained a statute of limitations clause that required suit be brought within one year after delivery of the goods. *Uncle Ben's*, 855 F. 2d at 215. The statute of

limitations clause was similar to that found in Section 3(6) of COGSA. The court applied the Harter Act to the care of the cargo before loading and held that the one year statute of limitations did not violate the Harter Act. *Id. Uncle Ben's* is of no assistance in answering the question whether a clause disclaiming liability for cargo damage is enforceable where COGSA applies as a matter of contract to deck cargo.

Finally, if for the sake of argument, Clause 3(a) retains some validity under U.S. law as Appellants contend, it is no argument at all that a Belgian court cannot be trusted because a Belgian court might enforce Clause 3(a) against Appellants. *See* Order, ER0010.

## D. Clause 15 of the Bill of Lading Has Been Upheld By The Ninth Circuit

Appellants argue that this Court should not enforce the Antwerp forum clause because they could not assert a claim against SSA in Belgium but could assert a claim against SSA in the United States. Appellants overlook a recent Ninth Circuit decision that enforced a covenant not to sue similar to Clause 15 under COGSA.

In *Federal Ins. Co. v. Union Pacific R. Co.*, 651 F.3d 1175 (9th Cir. 2011), the Ninth Circuit decided whether a clause that precludes the cargo owner from making a claim against a sub-contractor of the carrier (i.e. Union Pacific) or to impose liability on a sub-contractor of the Carrier is null and void under §3(8) of COGSA. The clause at issue in *Federal Ins. Co.* is substantially identical to the

-40-

Clause 15 at issue in this case. *Id.* at 1179. The Ninth Circuit first found that the Hague Rules applied as a matter of contract to the period following discharge pursuant to the Clause Paramount of the bill of lading. *Id.* at 1178-79. Since the Hague Rules are virtually identical to COGSA, the court applied precedent interpreting COGSA to the case. *Id.* at 1179. The Ninth Circuit held that the covenant not to sue did not violate §3(8) of COGSA because the requirement that suits be brought only against the carrier and not the contractors of the carrier such as the railroad was an enforcement "mechanism" and did not reduce the carrier's obligations below what COGSA guarantees. *Id.* at 1179-80 (citing *Sky Reefer* and *Fireman's Fund*). The Court held that "the Hague Rules and COGSA permit a carrier to accept exclusive liability for the negligence of its subcontractors." *Id.* at 1180. Thus, even a U.S. court applying COGSA as a matter of contract will enforce Clause 15 and there appears to be no difference between Belgian law and U.S. law when it comes to the enforceability of Clause 15. Nonetheless, to the extent Appellants disagree with the Ninth Circuit in *Federal Ins. Co.*, they can certainly make their argument to the Belgian court.

## E. A Belgian Court Is Capable Of Applying the Fair Opportunity Doctrine

The declarations of Cross Chartering's Belgian counsel, Luc Wijfels, confirm that a Belgian court will apply the fair opportunity doctrine because it is required to apply COGSA as the law of the contract. ER0029-0031 ¶¶9, 10, 11; ER0079 ¶9. Although the fair opportunity doctrine is not part of Belgian internal

-41-

law, the doctrine is not unknown in the Belgian maritime legal world.  ER0029 ¶9.
According to Mr. Wijfels, the Belgian courts are perfectly capable of applying the
fair opportunity doctrine as it is applied in the United States.  ER0031 ¶¶10, 11.
Appellants' Belgian counsel, Mr. Marcon, never says that a Belgian court will not
apply the fair opportunity doctrine.  He only says that the doctrine is unknown
under Belgian law, and that from his personal experience, while the Belgian court
is obliged to apply foreign law, there is a substantial risk that such foreign law is
not applied in the same manner as a U.S. court.  ER0059-0060 ¶6; ER0062 ¶9.
Again, a forum clause should not be set aside merely because "the foreign law or
procedure [may] be different or less favorable than that of the United States."
*Roby*, 996 F.2d. at 1363.  Appellants must establish that they would be deprived of
the right to pursue a statutory remedy or that the carrier's substantive obligations
to the cargo owner would be lessened below that which COGSA guarantees in a
Belgian court.  *Sky Reefer*, 515 U.S. at 539; *Fireman's Fund*, 131 F.3d at 1338;
*Pac Global Insurance v. Gramter Int'l,* 2008 A.M.C. 1766, 1769 (C.D. Cal. 2007).
They failed to make such a showing.

### 1. A Potential Diminished Recovery In Belgian Does Not Invalidate The Antwerp Forum Clause

*Pac Global* flatly rejected the very argument made by Appellants that there
is a risk that Cross Chartering may be able to limit its liability to a lesser sum in
Belgium than in the United States.  In *Pac Global*, Plaintiffs opposed the carrier's
motion to enforce a China forum clause in the bill of lading on the grounds that

enforcing the forum clause would "reduce the Defendants' obligation below what COGSA guarantees as it would deny Plaintiffs a substantive right of recovery to the full extent permitted by COGSA." *Id.* at 1770. Specifically, Plaintiffs argued that a Chinese court would not apply COGSA's package limitation law the way a U.S. court would because a Chinese court would find that a "container" was a "package" for purposes of COGSA's $500 per package limitation. *Id.* The court rejected Plaintiffs' argument and held that Plaintiffs must show that the application of Chinese law would reduce the carrier's substantive obligations below what COGSA requires and that a potential diminished recovery in a contractual forum is "not tantamount to a reduction of Defendants' [the carrier's] substantive obligations." *Id.* at 1772. Moreover, Judge Feess in *Pac Global* distinguishes the very cases which Appellants rely on, including his earlier decision in *Heli-Lift Ltd.* Judge Feess noted that *Heli-Lift Ltd.* (forum clause not enforced because German law precluded plaintiff's right of recovery for negligence), *Majestic Electronics* (forum clause not enforced because plaintiff would be precluded from pursuing monetary damages) and *Nippon Fire & Marine Ins. Co.* (forum clause not enforced because Japanese courts might enforce provisions in bill of lading which violated COGSA) were all cases where a foreign court would preclude a cause of action that a cargo owner had under COGSA. *Id.* at 1772-1773.

> "In short, the cases holding forum selection clauses unenforceable on the ground that they reduce a carrier's obligations to a cargo owner

below what COGSA guarantees deal with scenarios where application of foreign law entirely precludes a substantive right to recovery.

Here, by contrast, even if Chinese courts were to interpret COGSA in a way Plaintiffs contend, they would still be able to pursue their cause of action in a Chinese court, albeit with the expectation of diminished recovery. Put another way, while real differences may exist in the way that American and Chinese courts might interpret the law in the instant action, those differences do not alter Defendants' substantive obligations."

*Id.* at 1773. *See also Kelso Enterprises, Ltd.*, 8 F. Supp. at 1204 (while the British version of COGSA may include different monetary limitations on a carrier's liability, these limitations do not leave Plaintiff without a statutory remedy).

### 2. Appellants Were Afforded A Fair Opportunity To Declare A Higher Value And Avoid The $500 Limitation

Appellants argue that the Bill of Lading did not provide PAE with a fair opportunity to declare a higher value and avoid the $500 limitation. Whether or not PAE was afforded a fair opportunity to declare a higher value and avoid the limitation was never decided below because the District Court correctly left the issue to be decided by the Belgian court under U.S. law. ER0012. However, in the event the Court believes it is relevant, for the reasons explained to the District Court (SER016-SER021), Appellants were afforded a fair opportunity to declare a higher value and avoid the $500 per package limitation.

For purposes of brevity, we summarize the reasons why Cross Chartering satisfied the fair opportunity requirement under the facts of this case:

-44-

1)  The carrier bears the initial burden of establishing that it afforded the shipper an opportunity to avoid the COGSA limitation.  *Carman Tool & Abrasives v. Evergreen Lines*, 871 F.2d 897, 899 (9th Cir. 1989).  One way a carrier may satisfy its initial burden and the way a carrier normally establishes its *prima facie* case of fair opportunity is by "legibly reciting the terms of [COGSA] Section 4(5)" in the bill of lading.[14]  *Carman Tool*, 871 F.2d at 899; *Mori Seiki v. Alligator Triumph,* 990 F.2d 444, 449 (9th Cir. 1993).  The recitation need not be verbatim. *Institute of London Underwriters*, 881 F.2d 761, 766 n.2.  Language in the bill of lading "to the same effect" as the language of Section 4(5) is adequate.  *Mori Seiki*, 990 F.2d at 449.  The language does not need to appear on the front of the bill of lading and a space to declare a higher value is not required on the face of the bill of lading although the Bill of Lading in the instant case had a space for declared value on the front thereby providing further notice.  *Id.* at 449; ER0073; SER017.

2)  Having given notice that COGSA would apply to the yacht carried on deck, the Bill of Lading gave sufficient notice of the limitation and the opportunity to declare a higher value by effectively reciting the language of Section 4(5) of COGSA in the U.S. Trade Clause on the reverse side of the Bill of Lading:

---

[14]     The language in the bill of lading is not the only way for a carrier to satisfy the fair opportunity doctrine.  No Ninth Circuit case has so held.  Courts have examined the actual knowledge of the shipper where the bill of lading does not provide sufficient notice.  *See e.g. Royal Ins. Co. v. Sea-Land Service Inc.*, 50 F.3d 723, 728 (9th  Cir. 1995); *Royal Exchange Assurance of Am. Inc. v. M/V Hoegh Dene*, 1988 A.M.C. 868, 875-77 (W.D. Wa. 1987).

> If U.S. COGSA applies, and unless the nature and value of the cargo
> has been declared by the shipper before the cargo has been handed
> over to the Carrier and inserted in this Bill of Lading, the Carrier shall
> in no event be or become liable for any loss or damage to the cargo in
> an amount exceeding USD 500 per package or customary freight unit.

ER0074; SER017-SER018.

3)  Cross Chartering, having met its burden of providing *prima facie*
evidence of fair opportunity, the burden shifts to Appellants to disprove fair
opportunity.  *Mori Seiki,* 990 F.2d at 449; *Carman Tool*, 871 F.2d at 899.
Appellants cannot carry their burden of disproving fair opportunity.  *See e.g.*
*Institute of London Underwriters,* 881 F.2d at 766 (the burden was not carried
where the shipper was a sophisticated shipper of yachts, had shipped yachts with
the Carrier on several previous occasions and was familiar with carrier's form of
bill of lading).  SER096 ¶8; SER098 ¶15.

4)  The Booking Note signed by PAE before shipment in Taiwan also
provided notice to PAE that the $500 package limitation would apply unless it
declared a value for the yacht.  In a typewritten clause on the front of the Booking
Note under "Special Terms," the parties agreed:

> "CONLINE BOOKING NOTE AND B/L TERMS AND
> CONDITIONS APPLY, MERCHANT DECLARES NO VALUE
> AND US COGSA PACKAGE LIMITATION APPLIES."

ER0071.

5)  As they did below, Appellants rely almost exclusively on *Columbia*
*Machine* in arguing there was no "fair opportunity" in this case.  *Columbia*

-46-

*Machine* is inapposite.

In *Columbia Machine*, the cargo was carried on the deck of a vessel from Long Beach to New Zealand. Contrary to what Appellants asserted below, the court did not find that the Harter Act applied. *Columbia Machine*, 2008 A.M.C. at 646 ( ". . . Congress effectively superseded the Harter Act for international trade to or from American ports with COGSA, which, in effect, limited the Harter Act's application to domestic trade.") (citing *North River*, 647 F.2d at 987). Instead, the court concluded that Clause 15(2) controlled the carriage of the deck cargo rather than Clause 27(2) and that the Hague Rules, not COGSA or the Harter Act, applied to the deck cargo as a matter of contract. *Id.* at 649-651.

Having concluded that the Hague Rules "applied" to the deck cargo by contract under Clause 15(2) of the bill of lading, the court understandably concluded that Clause 27(2), which was similar to the U.S. Trade Clause in the instant case and contained the introductory language "[i]f U.S. COGSA applies," did not provide sufficient notice to satisfy the "fair opportunity" requirement because it did not reference the Hague Rules and its 100 pounds sterling per package or unit limitation. *Id.* at 652-653. The court did not find the introductory clause "[i]f COGSA applies" in Clause 27(2) to be ambiguous. Instead, it held that since the Hague Rules, not COGSA, applied to the deck cargo, Clause 15(2) and Clause 27 separately or read together failed to provide fair notice because neither contained the recitation of the Hague Rules' limitation of liability. *Id.*

*Columbia Machine* is inapposite because unlike the Bill of Lading in the instant case, the bill of lading in *Columbia Machine* did not provide for the application of COGSA to the deck cargo so Clause 27(2), which gave notice of the COGSA limitation provision but was conditional on the application of COGSA, did not apply. ER0007-0008; SER018-SER020.

6) Fair opportunity is also established by PAE choosing to insure the yacht with RLI. ER0082 ¶3. Since *Carman Tool,* the Ninth Circuit as well as other circuits have held that the carrier can meet its *prima facie* case of "fair opportunity" by proving that the cargo owner purchased insurance for the damaged cargo. *Carman Tool,* 871 F.2d at 910 n.10; *Traveler's Indemnity Co. v. The Vessel Sam Houston,* 26 F.3d 985, 900 (9th Cir. 1994); *Vision Air Flight Serv. v. M/V National Pride,* 155 F.3d 1165, 1169 (9th Cir. 1998); *Yang Mach. Tool Co. v. Sea-Land Serv.,* 58 F.3d 1350, 1355 (9th Cir. 1995); *Akiyama Corp. of Am. v. M.V. Hanjin Marseilles,* 162 F.3d 571, 573 (9th Cir. 1998); *Nippon Fire & Marine Ins. Co. v. M.V. Tourcoing,* 167 F.3d 99, 102 (2d Cir. 1999). PAE's decision to insure the yacht with RLI demonstrates that it made a conscious decision not to opt out of the $500 limitation. *See Vision Air*, 55 F.3d at 1169; *Traveler's Indemnity,* 26 F.3d at 900.

## CONCLUSION

Two experienced and sophisticated commercial parties agreed in their contract of carriage to resolve any disputes arising out of the carriage exclusively in an Antwerp court. Appellants disregarded their agreement and filed suit in the

wrong forum. Appellants have failed to establish any compelling reason why their agreement regarding the forum should not be upheld. The Belgian courts are perfectly capable of applying U.S. law and Appellants will not be deprived of their right to pursue their statutory remedies in a Belgian court nor will the substantive law to be applied in Belgium reduce Cross Chartering's obligations to Appellants below what COGSA guarantees.

For the reasons set forth herein, the District Court did not abuse its discretion in enforcing the Antwerp forum clause under the circumstances of this case and its decision should be affirmed.


Dated: October 31, 2011          s/ Alan Nakazawa
                                 Alan Nakazawa
                                 Cogswell Nakazawa & Chang, LLP
                                 Attorneys for the Appellee
                                 CROSS CHARTERING N.V.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(b) because this brief contains 13,947 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, Times New Roman, which is a font type that uses serifs, font size 14, using WordPerfect 10.

Dated: October 31, 2011          s/ Alan Nakazawa
                                  Alan Nakazawa
                                  Cogswell Nakazawa & Chang, LLP
                                  Attorneys for the Appellee
                                  CROSS CHARTERING N.V.

## STATEMENT OF RELATED CASES

There are no related cases that counsel for Cross Chartering are aware of.

Respectfully submitted by:

Dated: October 31, 2011

 s/ Alan Nakazawa
Alan Nakazawa
Cogswell Nakazawa & Chang, LLP
Attorneys for the Appellee
CROSS CHARTERING N.V.

# ADDENDUM

## <u>TABLE OF CONTENTS TO ADDENDUM</u>

<u>Description</u>                                                                                    <u>Page Nos.</u>

Hague Rules

(Brussels, August 25, 1924)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A001-A011


Hague Visby Rules

(Brussels Protocol 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A012-A022



## Admiralty and Maritime Law Guide
### International Conventions

HOME   SITE MAP

# International Convention for the Unification of Certain Rules of Law relating to Bills of Lading ("Hague Rules"), and Protocol of Signature

*(Brussels, 25 August 1924)*

The President of the German Republic, the President of the Argentine Republic, His Majesty the King of the Belgians, the President of the Republic of Chile, the President of the Republic of Cuba, His Majesty the King of Denmark and Iceland, His Majesty the King of Spain, the Head of the Estonian State, the President of the United States of America, the President of the Republic of Finland, the President of the French Republic, His Majesty the King of the United Kingdom of Great Britain and Ireland and of the British Dominions beyond the Seas, Emperor of India, His Most Supreme Highness the Governor of the Kingdom of Hungary, His Majesty the King of Italy, His Majesty the Emperor of Japan, the President of the Latvian Republic, the President of the Republic of Mexico, His Majesty the King of Norway, Her Majesty the Queen of the Netherlands, the President of the Republic of Peru, the President of the Polish Republic, the President of the Portuguese Republic, His Majesty the King of Romania, His Majesty the King of the Serbs, Croats and Slovenes, His Majesty the King of Sweden, and the President of the Republic of Uruguay,

**HAVING RECOGNIZED** the utility of fixing by agreement certain uniform rules of law relating to bills of lading,

**HAVE DECIDED** to conclude a convention with this object and have appointed the following Plenipotentiaries:

**WHO, duly authorized thereto, have agreed as follows:**

Article 1

In this Convention the following words are employed with the meanings set

out below:

(a) "Carrier" includes the owner or the charterer who enters into a contract of carriage with a shipper.

(b) "Contract of carriage" applies only to contracts of carriage covered by a bill of lading or any similar document of title, in so far as such document relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same.

(c) "Goods" includes goods, wares, merchandise and articles of every kind whatsoever except live animals and cargo which by the contract of carriage in stated as being carried on deck and is so carried.

(d) "Ship" means any vessel used for the carriage of goods by sea.

(e) "Carriage of goods" covers the period from the time when the goods are loaded on to the time they are discharged from the ship.

## Article 2

Subject to the provisions of Article 6, under every contract of carriage of goods by sea the carrier, in relation to the loading, handling, stowage, carriage, custody, care and discharge of such goods, shall be subject to the responsibilities and liabilities, and entitled to the rights and immunities hereinafter set forth.

## Article 3

1. The carrier shall be bound before and at the beginning of the voyage to exercise due diligence to:

(a) Make the ship seaworthy.

(b) Properly man, equip and supply the ship.

(c) Make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation.

2. Subject to the provisions of Article 4, the carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

A002

3. After receiving the goods into his charge the carrier or the master or agent of the carrier shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things:

(a) The leading marks necessary for identification of the goods as the same are furnished in writing by the shipper before the loading of such goods starts, provided such marks are stamped or otherwise shown clearly upon the goods if uncovered, or on the cases or coverings in which such goods are contained, in such a manner as should ordinarily remain legible until the end of the voyage.

(b) Either the number of packages or pieces, or the quantity, or weight, as the case may be, as furnished in writing by the shipper.

(c) The apparent order and condition of the goods.

Provided that no carrier, master or agent of the carrier shall be bound to state or show in the bill of lading any marks, number, quantity, or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking.

4. Such a bill of lading shall be *prima facie* evidence of the receipt by the carrier of the goods as therein described in accordance with paragraph 3(a), (b) and (c).

5. The shipper shall be deemed to have guaranteed to the carrier the accuracy at the time of shipment of the marks, number, quantity and weight, as furnished by him, and the shipper shall indemnify the carrier against all loss, damages and expenses arising or resulting from inaccuracies in such particulars. The right of the carrier to such indemnity shall in no way limit his responsibility and liability under the contract of carriage to any person other than the shipper.

6. Unless notice of loss or damage and the general nature of such loss or damage be given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, or, if the loss or damage be not apparent, within three days, such removal shall be *prima facie* evidence of the delivery by the carrier of the goods as described in the bill of lading.

If the loss or damage is not apparent, the notice must be given within three

days of the delivery of the goods.

The notice in writing need not be given if the state of the goods has, at the time of their receipt, been the subject of joint survey or inspection.

In any event the carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit is brought within one year after delivery of the goods or the date when the goods should have been delivered.

In the case of any actual or apprehended loss or damage the carrier and the receiver shall give all reasonable facilities to each other for inspecting and tallying the goods.

7. After the goods are loaded the bill of lading to be issued by the carrier, master, or agent of the carrier, to the shipper shall, if the shipper so demands, be a "shipped" bill of lading, provided that if the shipper shall have previously taken up any document of title to such goods, he shall surrender the same as against the issue of the "shipped" bill of lading, but at the option of the carrier such document of title may be noted at the port of shipment by the carrier, master, or agent with the name or names of the ship or ships upon which the goods have been shipped and the date or dates of shipment, and when so noted, if it shows the particulars mentioned in paragraph 3 of Article 3, shall for the purpose of this Article be deemed to constitute a "shipped" bill of lading.

8. Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to, or in connexion with, goods arising from negligence, fault, or failure in the duties and obligations provided in this Article or lessening such liability otherwise than as provided in this Convention, shall be null and void and of no effect. A benefit of insurance in favour of the carrier or similar clause shall be deemed to be a clause relieving the carrier from liability.

## Article 4

1. Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy and to secure that the ship is properly manned, equipped and supplied, and to make the holds, refrigerating and cool chambers and all other parts of the ship in which goods are carried fit and safe for their reception, carriage and preservation in accordance with the provisions of paragraph 1 of Article 3. Whenever loss

A004

or damage has resulted from unseaworthiness the burden of proving the exercise of due diligence shall be on the carrier or other person claiming exemption under this Article.

2. Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from:

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship.

(b) Fire, unless caused by the actual fault or privity of the carrier.

(c) Perils, dangers and accidents of the sea or other navigable waters.

(d) Act of God.

(e) Act of war.

(f) Act of public enemies.

(g) Arrest or restraint or princes, rulers or people, or seizure under legal process.

(h) Quarantine restrictions.

(i) Act or omission of the shipper or owner of the goods, his agent or representative.

(j) Strikes or lockouts or stoppage or restraint of labour from whatever cause, whether partial or general.

(k) Riots and civil commotions.

(l) Saving or attempting to save life or property at sea.

(m) Wastage in bulk or weight or any other loss or damage arising from inherent defect, quality or vice of the goods.

(n) Insufficiency of packing.

(o) Insufficiency or inadequacy of marks.

(p) Latent defects not discoverable by due diligence.

(q) Any other cause arising without the actual fault or privity of the carrier, or without the actual fault or neglect of the agents or servants of the

carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage.

3. The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault or neglect of the shipper, his agents or his servants.

4. Any deviation in saving or attempting to save life or property at sea or any reasonable deviation shall not be deemed to be an infringement or breach of this Convention or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom.

5. Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connexion with goods in an amount exceeding 100 pounds sterling per package or unit, or the equivalent of that sum in other currency unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

This declaration if embodied in the bill of lading shall be *prima facie* evidence, but shall not be binding or conclusive on the carrier.

By agreement between the carrier, master or agent of the carrier and the shipper another maximum amount than that mentioned in this paragraph may be fixed, provided that such maximum shall not be less than the figure above named.

Neither the carrier nor the ship shall be responsible in any event for loss or damage to, or in connexion with, goods if the nature or value thereof has been knowingly misstated by the shipper in the bill of lading.

6. Goods of an inflammable, explosive or dangerous nature to the shipment whereof the carrier, master or agent of the carrier has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place, or destroyed or rendered innocuous by the carrier without compensation and the shipper of such goods shall be liable for all damage and expenses directly or indirectly arising out of or resulting from such shipment. If any such goods shipped with such knowledge and consent shall become a danger to the ship or cargo, they may in like manner be landed at any place, or destroyed or rendered innocuous by the carrier without liability on the part of the carrier except to general average, if any.

## Article 5

A carrier shall be at liberty to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and obligations under this Convention, provided such surrender or increase shall be embodied in the bill of lading issued to the shipper.

The provisions of this Convention shall not be applicable to charter parties, but if bills of lading are issued in the case of a ship under a charter party they shall comply with the terms of this Convention. Nothing in these rules shall be held to prevent the insertion in a bill of lading of any lawful provision regarding general average.

## Article 6

Notwithstanding the provisions of the preceding Articles, a carrier, master or agent of the carrier and a shipper shall in regard to any particular goods be at liberty to enter into any agreement in any terms as to the responsibility and liability of the carrier for such goods, and as to the rights and immunities of the carrier in respect of such goods, or his obligation as to seaworthiness, so far as this stipulation is not contrary to public policy, or the care or diligence of his servants or agents in regard to the loading, handling, stowage, carriage, custody, care and discharge of the goods carried by sea, provided that in this case no bill of lading has been or shall be issued and that the terms agreed shall be embodied in a receipt which shall be a non-negotiable document and shall be marked as such.

Any agreement so entered into shall have full legal effect.

Provided that this Article shall not apply to ordinary commercial shipments made in the ordinary course of trade, but only to other shipments where the character or condition of the property to be carried or the circumstances, terms and conditions under which the carriage is to be performed are such as reasonably to justify a special agreement.

## Article 7

Nothing herein contained shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to, or in connexion with, the custody and care and handling of goods prior to the loading on, and subsequent to, the discharge from the ship on which the goods are carried by sea.

A007

## Article 8

The provisions of this Convention shall not affect the rights and obligations of the carrier under any statute for the time being in force relating to the limitation of the liability of owners of sea-going vessels.

## Article 9

The monetary units mentioned in this Convention are to be taken to be gold value.

Those contracting States in which the pound sterling is not a monetary unit reserve to themselves the right of translating the sums indicated in this Convention in terms of pound sterling into terms of their own monetary system in round figures.

The national laws may reserve to the debtor the right of discharging his debt in national currency according to the rate of exchange prevailing on the day of the arrival of the ship at the port of discharge of the goods concerned.

## Article 10

The provisions of this Convention shall apply to all bills of lading issued in any of the contracting States.

## Article 11

After an interval of not more than two years from the day on which the Convention is signed, the Belgian Government shall place itself in communication with the Governments of the High Contracting Parties which have declared themselves prepared to ratify the Convention, with a view to deciding whether it shall be put into force. The ratifications shall be deposited at Brussels at a date to be fixed by agreement among the said Governments. The first deposit of ratifications shall be recorded in a *procès-verbal* signed by the representatives of the Powers which take part therein and by the Belgian Minister of Foreign Affairs.

The subsequent deposit of ratifications shall be made by means of a written notification, addressed to the Belgian Government and accompanied by the instrument of ratification.

A duly certified copy of the *procès-verbal* relating to the first deposit of ratifications, of the notifications referred to in the previous paragraph, and

also of the instruments of ratification accompanying them, shall be immediately sent by the Belgian Government through the diplomatic channel to the Powers who have signed this Convention or who have acceded to it. In the cases contemplated in the preceding paragraph, the said Government shall inform them at the same time of the date on which it received the notification.

## Article 12

Non-signatory States may accede to the present Convention whether or not they have been represented at the International Conference at Brussels.

A State which desires to accede shall notify its intention in writing to the Belgian Government, forwarding to it the document of accession, which shall be deposited in the archives of the said Government.

The Belgian Government shall immediately forward to all the States which have signed or acceded to the Convention a duly certified copy of the notification and of the act of accession, mentioning the date on which it received the notification.

## Article 13

The High Contracting Parties may at the time of signature, ratification or accession declare that their acceptance of the present Convention does not include any or all of the self-governing dominions, or of the colonies, overseas possessions, protectorates or territories under their sovereignty or authority, and they may subsequently accede separately on behalf of any self-governing dominion, colony, overseas possession, protectorate or territory excluded in their declaration. They may also denounce the Convention separately in accordance with its provisions in respect of any self-governing dominion, or any colony, overseas possession, protectorate or territory under their sovereignty or authority.

## Article 14

The present Convention shall take effect, in the case of the States which have taken part in the first deposit of ratifications, one year after the date of the protocol recording such deposit.

As respects the States which ratify subsequently or which accede, and also in cases in which the Convention is subsequently put into effect in accordance with Article 13, it shall take effect six months after the notifications specified in paragraph 2 of Article 11 and paragraph 2 of Article

12 have been received by the Belgian Government.

## Article 15

In the event of one of the contracting States wishing to denounce the present Convention, the denunciation shall be notified in writing to the Belgian Government, which shall immediately communicate a duly certified copy of the notification to all the other States, informing them of the date on which it was received.

The denunciation shall only operate in respect of the State which made the notification, and on the expiry of one year after the notification has reached the Belgian Government.

## Article 16

Any one of the contracting States shall have the right to call for a fresh conference with a view to considering possible amendments.

A State which would exercise this right should notify its intention to the other States through the Belgian Government, which would make arrangements for convening the Conference.

**DONE** at Brussels, in a single copy, August 25th, 1924.

---

# PROTOCOL OF SIGNATURE

At the time of signing the International Convention for the Unification of Certain Rules of Law relating to Bills of Lading the Plenipotentiaries whose signatures appear below have adopted this Protocol, which will have the same force and the same value as if its provisions were inserted in the text of the Convention to which it relates.

The High Contracting Parties may give effect to this Convention either by giving it the force of law or by including in their national legislation in a form appropriate to that legislation the rules adopted under this Convention.

They may reserve the right:

1. To prescribe that in the cases referred to in paragraph 2(c) to (p) of Article 4 the holder of a bill of lading shall be entitled to establish responsibility for loss or damage arising from the personal fault of the carrier

or the fault of his servants which are not covered by paragraph (a).

2. To apply Article 6 in so far as the national coasting trade is concerned to all classes of goods without taking account of the restriction set out in the last paragraph of that Article.

**DONE** at Brussels, in single copy, August 25th, 1924.

 Top of Page

# The Hague-Visby Rules - The Hague Rules as Amended by the Brussels Protocol 1968

## multilateral

copy @ lexmercatoria.org

Copyright © 1968 multilateral

A013

# Contents

**The Hague-Visby Rules - The Hague Rules as Amended by the Brussels Protocol 1968**  1

    Article I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Article II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Article III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    Article IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Article IV bis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Article V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Article VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Article VII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Article VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Article IX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    Article X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

**Metadata**  8

    SiSU Metadata, document information . . . . . . . . . . . . . . . . . . . . . 8

A014

# The Hague-Visby Rules - The Hague Rules as Amended by the Brussels Protocol 1968

## Article I

In these Rules the following words are employed, with the meanings set out below:

(a) `Carrier' includes the owner or the charterer who enters into a contract of carriage with a shipper.

(b) `Contract of carriage' applies only to contracts of carriage covered by a bill of lading or any similar document of title, in so far as such document relates to the carriage of goods by sea, including any bill of lading or any similar document as aforesaid issued under or pursuant to a charter party from the moment at which such bill of lading or similar document of title regulates the relations between a carrier and a holder of the same.

(c) `Goods' includes goods, wares, merchandise, and articles of every kind whatsoever except live animals and cargo which by the contract of carriage is stated as being carried on deck and is so carried.

(d) `Ship' means any vessel used for the carriage of goods by sea.

(e) `Carriage of goods' covers the period from the time when the goods are loaded on to the time they are discharged from the ship.

## Article II

Subject to the provisions of Article VI, under every contract of carriage of goods by sea the carrier, in relation to the loading, handling, stowage, carriage, custody, care and discharge of such goods, shall be subject to the responsibilities and liabilities and entitled to the rights and immunities hereinafter set forth.

## Article III

1. The carrier shall be bound before and at the beginning of the voyage to exercise due diligence to:

(a) Make the ship seaworthy;

(b) Properly man, equip and supply the ship;

(c) Make the holds, refrigerating and cool chambers, and all other parts of the ship in which goods are carried, fit and safe for their reception, carriage and preservation.

2. Subject to the provisions of Article IV, the carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried.

3. After receiving the goods into his charge the carrier or the master or agent of the

carrier shall, on demand of the shipper, issue to the shipper a bill of lading showing among other things:

(a) The leading marks necessary for identification of the goods as the same are fur- 18 nished in writing by the shipper before the loading of such goods starts, provided such marks are stamped or otherwise shown clearly upon the goods if uncovered, or on the cases or coverings in which such goods are contained, in such a manner as should ordinarily remain legible until the end of the voyage.

(b) Either the number of packages or pieces, or the quantity, or weight, as the case may 19 be, as furnished in writing by the shipper.

(c) The apparent order and condition of the goods. 20

Provided that no carrier, master or agent of the carrier shall be bound to state or show 21 in the bill of lading any marks, number, quantity or weight which he has reasonable ground for suspecting not accurately to represent the goods actually received, or which he has had no reasonable means of checking.

4. Such a bill of lading shall be prima facie evidence of the receipt by the carrier of the 22 goods as therein described in accordance with paragraph 3 (a), (b) and (c). However, proof to the contrary shall not be admissible when the bill of lading has been transferred to a third party acting in good faith.

5. The shipper shall be deemed to have guaranteed to the carrier the accuracy at the 23 time of shipment of the marks, number, quantity and weight, as furnished by him, and the shipper shall indemnify the carrier against all loss, damages and expenses arising or resulting from inaccuracies in such particulars. The right of the carrier to such indemnity shall in no way limit his responsibility and liability under the contract of carriage to any person other than the shipper.

6. Unless notice of loss or damage and the general nature of such loss or damage be 24 given in writing to the carrier or his agent at the port of discharge before or at the time of the removal of the goods into the custody of the person entitled to delivery thereof under the contract of carriage, or, if the loss or damage be not apparent, within three days, such removal shall be prima facie evidence of the delivery by the carrier of the goods as described in the bill of lading.

The notice in writing need not be given if the state of the goods has, at the time of their 25 receipt, been the subject of joint survey or inspection.

Subject to paragraph 6bis the carrier and the ship shall in any event be discharged from 26 all liability whatsoever in respect of the goods, unless suit is brought within one year of their delivery or of the date when they should have been delivered. This period, may however, be extended if the parties so agree after the cause of action has arisen.

In the case of any actual or apprehended loss or damage the carrier and the re- 27 ceiver shall give all reasonable facilities to each other for inspecting and tallying the goods.

6 bis. An action for indemnity against a third person may be brought even after the 28

A016

expiration of the year provided for in the preceding paragraph if brought within the time allowed by the law of the Court seized of the case. However, the time allowed shall be not less than three months, commencing from the day when the person bringing such action for indemnity has settled the claim or has been served with process in the action against himself.

7, After the goods are loaded the bill of lading to be issued by the carrier, master, or   29
agent of the carrier, to the shipper shall, if the shipper so demands be a `shipped' bill of lading, provided that if the shipper shall have previously taken up any document of title to such goods, he shall surrender the same as against the issue of the `shipped' bill of lading, but at the option of the carrier such document of title may be noted at the port of shipment by the carrier, master, or agent with the name or names of the ship or ships upon which the goods have been shipped and the date or dates of shipment, and when so noted, if it shows the particulars mentioned in paragraph 3 of Article III, shall for the purpose of this article be deemed to constitute a `shipped' bill of lading.

8. Any clause, covenant, or agreement in a contract of carriage relieving the carrier   30
or the ship from liability for loss or damage to, or in connection with, goods arising from negligence, fault, or failure in the duties and obligations provided in this article or lessening such liability otherwise than as provided in these Rules, shall be null and void and of no effect. A benefit of insurance in favour of the carrier or similar clause shall be deemed to be a clause relieving the carrier from liability.

## Article IV   31

1. Neither the carrier nor the ship shall be liable for loss or damage arising or resulting   32
from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped and supplied, and to make the holds, refrigerating and cool chambers and all other parts of the ship in which goods are carried fit and safe for their reception, carriage and preservation in accordance with the provisions of paragraph 1 of Article III. Whenever loss or damage has resulted from unseaworthiness the burden of proving the exercise of due diligence shall be on the carrier or other person claiming exemption under this article.

2. Neither the carrier nor the ship shall be responsible for loss or damage arising or   33
resulting from:

(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in   34
the navigation or in the management of the ship.

(b) Fire, unless caused by the actual fault or privity of the carrier.   35

(c) Perils, dangers and accidents of the sea or other navigable waters.   36

(d) Act of God.   37

(e) Act of war.   38

(f) Act of public enemies.   39

A017

(g) Arrest or restraint of princes, rulers or people, or seizure under legal process. 40

(h) Quarantine restrictions. 41

(i) Act or omission of the shipper or owner of the goods, his agent or representative. 42

(j) Strikes or lockouts or stoppage or restraint of labour from whatever cause, whether partial or general. 43

(k) Riots and civil commotions. 44

(l) Saving or attempting to save life or property at sea. 45

(m) Wastage in bulk of weight or any other loss or damage arising from inherent defect, quality or vice of the goods. 46

(n) Insufficiency of packing. 47

(o) Insufficiency or inadequacy of marks. 48

(p) Latent defects not discoverable by due diligence. 49

(q) Any other cause arising without the actual fault or privity of the carrier, or without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception to show that neither the actual fault or privity of the carrier nor the fault or neglect of the agents or servants of the carrier contributed to the loss or damage. 50

3. The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault or neglect of the shipper, his agents or his servants. 51

4. Any deviation in saving or attempting to save life or property at sea or any reasonable deviation shall not be deemed to be an infringement or breach of these Rules or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom. 52

5 (a) Unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading, neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the goods in an amount exceeding the equivalent of 666.67 units of account per package or unit or units of account per kilo of gross weight of the goods lost or damaged, whichever is the higher. 53

(b) The total amount recoverable shall be calculated by reference to the value of such goods at the place and time at which the goods are discharged from the ship in accordance with the contract or should have been so discharged. 54

The value of the goods shall be fixed according to the commodity exchange price, or, if there be no such price, according to the current market price, or, if there be no commodity exchange price or current market price, by reference to the normal value of goods of the same kind and quality. 55

(c) Where a container, pallet or similar article of transport is used to consolidate goods, the number of packages or units enumerated in the bill of lading as packed in such article of transport shall be deemed the number of packages or units for the purpose of this paragraph as far as these packages or units are concerned. Except as aforesaid such article of transport shall be considered the package or unit. 56

(d) The unit of account mentioned in this Article is the special drawing right as defined by the International Monetary Fund. The amounts mentioned in h_visby/art/art04_5asub-paragraph (a) of this paragraph shall be converted into national currency on the basis of the value of that currency on a date to be determined by the law of the Court seized of the case. 57

(e) Neither the carrier nor the ship shall be entitled to the benefit of the limitation of liability provided for in this paragraph if it is proved that the damage resulted from an act or omission of the carrier done with intent to cause damage, or recklessly and with knowledge that damage would probably result. 58

(f) The declaration mentioned in sub-paragraph (a) of this paragraph, if embodied in the bill of lading, shall be prima facie evidence, but shall not be binding or conclusive on the carrier. 59

(g) By agreement between the carrier, master or agent of the carrier and the shipper other maximum amounts than those mentioned in sub-paragraph (a) of this paragraph may be fixed, provided that no maximum amount so fixed shall be less than the appropriate maximum mentioned in that sub-paragraph. 60

(h) Neither the carrier nor the ship shall be responsible in any event for loss or damage to, or in connection with, goods if the nature or value thereof has been knowingly mis-stated by the shipper in the bill of lading. 61

6. Goods of an inflammable, explosive or dangerous nature to the shipment whereof the carrier, master or agent of the carrier has not consented with knowledge of their nature and character, may at any time before discharge be landed at any place, or destroyed or rendered innocuous by the carrier without compensation and the shipper of such goods shall be liable for all damages and expenses directly or indirectly arising out of or resulting from such shipment. If any such goods shipped with such knowledge and consent shall become a danger to the ship or cargo, they may in like manner be landed at any place, or destroyed or rendered innocuous by the carrier without liability on the part of the carrier except to general average, if any. 62

### Article IV bis 63

1. The defences and limits of liability provided for in these Rules shall apply in any action against the carrier in respect of loss or damage to goods covered by a contract of carriage whether the action be founded in contract or in tort. 64

2. If such an action is brought against a servant or agent of the carrier (such servant or agent not being an independent contractor), such servant or agent shall be entitled to 65

avail himself of the defences and limits of liability which the carrier is entitled to invoke under these Rules.

3. The aggregate of the amounts recoverable from the carrier, and such servants and agents, shall in no case exceed the limit provided for in these Rules. 66

4. Nevertheless, a servant or agent of the carrier shall not be entitled to avail himself of the provisions of this article, if it is proved that the damage resulted from an act or omission of the servant or agent done with intent to cause damage or recklessly and with knowledge that damage would probably result. 67

## Article V 68

A carrier shall be at liberty to surrender in whole or in part all or any of his rights and immunities or to increase any of his responsibilities and obligations under these Rules, provided such surrender or increase be embodied in the bill of lading issued to the shipper. The provisions of these Rules shall not be applicable to charter parties, but if bills of lading are issued in the case of a ship under a charter party they shall comply with the terms of these Rules. Nothing in these Rules shall be held to prevent the insertion in a bill of lading of any lawful provision regarding general average. 69

## Article VI 70

Notwithstanding the provisions of the preceding articles, a carrier, master or agent of the carrier and a shipper shall in regard to any particular goods be at liberty to enter into any agreement in any terms as to the responsibility and liability of the carrier for such goods, and as to the rights and immunities of the carrier in respect of such goods, or his obligation as to seaworthiness, so far as this stipulation is not contrary to public policy, or the care or diligence of his servants or agents in regard to the loading, handling, stowage, carriage, custody, care and discharge of the goods carried by sea, provided that in this case no bill of lading has been or shall be issued and that the terms agreed shall be embodied in a receipt which shall be a non-negotiable document and shall be marked as such. 71

An agreement so entered into shall have full legal effect. 72

Provided that this article shall not apply to ordinary commercial shipments made in the ordinary course of trade, but only to other shipments where the character or condition of the property to be carried or the circumstances, terms and conditions under which the carriage is to be performed are such as reasonably to justify a special agreement. 73

## Article VII 74

Nothing herein contained shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to, or in connection with, the 75

A020

custody and care and handling of goods prior to the loading on, and subsequent to the discharge from, the ship on which the goods are carried by sea.

### Article VIII 76

The provisions of these Rules shall not affect the rights and obligations of the carrier 77 under any statute for the time being in force relating to the limitation of the liability of owners of sea-going vessels.

### Article IX 78

These Rules shall not affect the provisions of any international Convention or national 79 law governing liability for nuclear damage.

### Article X 80

The provisions of these Rules shall apply to every bill of lading relating to the carriage 81 of goods between ports in two different States if

(a) the bill of lading is issued in a contracting State, or 82

(b) the carriage is from a port in a contracting State, or 03

(c) the contract contained in or evidenced by the bill of lading provides that these Rules 84 or legislation of any State giving effect to them are to govern the contract;

whatever may be the nationality of the ship, the carrier, the shipper, the consignee, or 85 any other interested person.

(The last two paragraphs of this Article are not reproduced. They require contracting 86 States to apply the Rules to bills of lading mentioned in the Article and authorise them to apply the Rules to other bills of lading).

(Article 11 to 16 of the International Convention for the unification of certain rules of law 87 relating to bills of lading signed at Brussels on August 25, 1974 are not reproduced. They deal with the coming into force of the Convention, procedure for ratification, accession and denunciation and the right to call for a fresh conference to consider amendments to the Rules contained in the Convention).

A021

The Hague-Visby Rules - The Hague Rules as Amended by the Brussels Protocol 1968

## Metadata

### SiSU Metadata, document information

**Document Manifest @:**

‹http://www.jus.uio.no/lm/sea.carriage.hague.visby.rules.1968/sisu_manifest.html›

**Title:** The Hague-Visby Rules - The Hague Rules as Amended by the Brussels Protocol 1968

**Creator:** multilateral

**Rights:** Copyright (C) 1968 multilateral

**Publisher:** SiSU ‹http://www.jus.uio.no/sisu› (this copy)

**Date:** 1968

**Topics Registered:** carriage:goods:sea:liability

**Version Information**

**Sourcefile:** sea.carriage.hague.visby.rules.1968.sst

**Filetype:** SiSU text 2.0

**Source Digest:** SHA256(sea.carriage.hague.visby.rules.1968.sst)=7286191afc7dcebc62a68079f1a744a498c33839-6927d1fd202cdd16e5ad6cc9

**Skin Digest:** SHA256(skin_lm.rb)=5acda64a9532f9ef6b71693da2b471d4efac2f23a8499e68de066eec8ea9b8e9

**Generated**

**Document (dal) last generated:** Tue Sep 21 17:31:55 -0400 2010

**Generated by:** SiSU 2.6.3 of 2010w30/3 (2010-07-28)

**Ruby version:** ruby 1.8.7 (2010-08-16 patchlevel 302) [i486-linux]

A022

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the Appellate CM/ECF system on October 31, 2011.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*Katerina Nelson*

Katerina Nelson

## PROOF OF SERVICE

I am employed in the City and County of Los Angeles by the law firm of

COGSWELL NAKAZAWA & CHANG, LLP, 444 West Ocean Boulevard, Suite

1250, Long Beach, California 90802. I am over the age of 18 years and not a party

to the within action. I am readily familiar with the practice COGSWELL

NAKAZAWA & CHANG, LLP with respect to the collection and processing of

pleadings, discovery documents, motions and all other documents which must be

served upon opposing parties or other counsel in litigation.  On October 31, 2011,

I electronically filed with the Office of the Clerk, U.S. Court of Appeals for the

Ninth Circuit, the following document(s):

### APPELLEE CROSS CHARTERING N.V.'S BRIEF

which will be served by electronic mail notice on the following:

James J. McMullen, Jr.
JMcMullen@GordonRees.com; Plangevin@gordomees.com

Stanley L. Gibson
sgibson@gibsonrobb.com

I declare under penalty of perjury under the laws of the State of California

that the above is true and correct.

Executed on October 31, 2011, at Long Beach, California.

Katerina Nelson
Katerina Nelson